GLORIA MCGILL et al., Respondents, v PEGGY PARKER et al., Appellants.

First Department, March 24, 1992

## APPEARANCES OF COUNSEL

*R. Jay Fortin* of counsel *(Erik W. Hepler* and *Cynthia Colt* with him on the brief; *Winthrop, Stimson, Putnam & Roberts,* attorneys), for Peggy Parker and others, appellants.

*Richard T. Mermelstein* of counsel *(Therese E. White* with him on the brief; *Jones Hirsch Connors & Bull,* attorneys), for John F. Kullberg and another, appellants.

*Lonnie S. Rosenberg* of counsel *(Jill Randy Epstein* and *Frank S. Benjamin* with him on the brief; *Rosenberg & Epstein,* attorneys), for respondents.

## OPINION OF THE COURT

SULLIVAN, J. P.

This lawsuit based, *inter alia,* on allegations of defamation and conspiracy, is an outgrowth of the controversy over the treatment of New York City's carriage horses, a controversy which ultimately resulted in the enactment of Local Laws, 1989, No. 89 of the City of New York. The law regulates the working conditions of these horses, requires drivers to take and successfully complete a training course on equine care and traffic laws and, in response to industry concerns of financial hardship by virtue of its requirements, provides for a 100% fare increase. In addition, horse-drawn carriages must now be covered by liability insurance.

Throughout the legislative process and for some years before, defendants, The Carriage Horse Action Committee (CHAC), organized in 1986 and dedicated to ending the abuse of carriage horses in New York City; Peggy Parker, its founder; Holly Cheever, an equine veterinarian and member of CHAC; The American Society for the Prevention of Cruelty to Animals (ASPCA), a not-for-profit corporation having enforcement responsibility of the animal protection laws in New York State, and John F. Kullberg, its president, lobbied in support of legislation to improve the living and working conditions of carriage horses in New York City. Their letters to public officials and the editors of various news publications and leaflets distributed to those on CHAC's mailing list are the subject of this lawsuit. Plaintiffs Gloria McGill, Arthur "Buster" McGill and Chateau Stables, Inc., are carriage horse

owners and operators who fought strenuously and unsuccess-
fully against the enactment of Local Law No. 89. They con-
tend that the letters and leaflets are libelous.

The allegations of the complaint encompass six letters and
one flyer. The first cause of action is based on an April 19,
1989 letter, eventually published in the New York Times,
from Cheever to the editor, written in response to a letter
published in the Times by a public relations consultant to the
carriage horse industry. In the only specific reference to any
of the plaintiffs, Dr. Cheever described the author of the
original letter as "worth every penny that Chateau Stables
pays him to promote its image." The balance of the letter
concerns Dr. Cheever's credentials and her detailed descrip-
tion of the unhealthy and inhumane conditions under which,
according to her, carriage horses are forced to live. The sixth
cause of action also involves the April 19, 1989 letter with a
more expansive allegation of damages.

The second cause of action involves a January 4, 1989 letter
from Dr. Cheever to Mr. Kullberg reporting her findings with
respect to a December 27, 1988 inspection, her second, of three
carriage horse stables, one of which was Chateau Stables. As
to Chateau Stables, Dr. Cheever reported that the horses were
housed in an area "completely unacceptable and unsuitable",
and accessible only by a "steep, narrow [and] dangerous
ramp"; that the stalls and aisles were "filthy"; that the stalls
were too narrow and short, with worn-away flooring, causing
urine pooling, which resulted in urine scald and foot infection;
that only 10 to 20% of the stalls had salt blocks; that the
"[v]entilation was inadequate with excessive ammonia levels";
that there was "more overt ill-health with lack of proper care
in this stable than in the [other] two"; that three horses were
suffering from specifically identified veterinary maladies and
that the stable presented "a serious fire hazard" with such
poor ventilation and lack of cleanliness that the health of the
horses was "severely compromised", so as to constitute a clear
"form of abuse." There was no allegation that Mr. Kullberg
took any action with respect to this letter other than to
receive it. The third and fourth causes of action, respectively,
allege that Dr. Cheever sent copies of the letter to Ms. Parker
and to William Kapps, a nonparty not otherwise identified.

The fifth cause of action is based on a March 20, 1989 letter
from Dr. Cheever to the editor of 7 Days, a weekly magazine,
opposing the proposed "diaper" solution to the manure prob-
lem. The letter, which never appeared in the publication,

includes general comments, similar to those in the January 4, 1989 letter, about conditions in the stables housing carriage horses. Although the letter does not make any reference to Chateau Stables, plaintiffs allege that it is "of and concerning" them in that they are part of the carriage horse trade.

The seventh cause of action concerns a May 31, 1989 letter in support of the proposed Local Law from Dr. Cheever to the New York City Council extensively describing the poor conditions to which carriage horses are exposed in New York City.[1] There is no specific mention of Chateau Stables, although there is a reference to "[o]ne stable I inspected." Again, plaintiffs allege that the letter is "of and concerning" them.

The eighth cause of action is based on a March 14, 1989 letter, never published, from Ms. Parker to Diana DeRosa, the editor of Horse World USA, challenging the conditions found by DeRosa in her visits to " 'some' " New York City stables. In her letter, Ms. Parker suggested that Ms. DeRosa, whose inspection revealed conditions quite different from those she and Dr. Cheever witnessed, must have been "invited" to a " 'staged' presentation", most certainly by Chateau Stables since the McGills "have been very reliant on PR to defend their business." Ms. Parker's comments about the stable conditions in that letter are general in nature. The ninth cause of action repeats the allegations concerning the March 14, 1989 Parker letter with emphasis on the conspiracy to injure plaintiffs.

The tenth cause of action involves a June 12, 1989 letter from Ms. Parker to Henry J. Stern, the then Commissioner of the New York City Department of Parks and Recreation, with respect to the legislative hearings on the proposed Local Law No. 89. In it, Ms. Parker compared New York City's carriage horse trade unfavorably with that of Indianapolis, with which she was familiar. No mention is made of Chateau Stables but, again, plaintiffs repeat the same "of and concerning" allegation.

The eleventh cause of action charges "[d]efendants" with publicly distributing a flyer repeating the statements as to the deplorable conditions in which carriage horses are compelled to live and, in calling for restrictive legislation, accusing the carriage trade industry of "deport[ing] itself in an almost

---

1. Dr. Cheever states that the letter constitutes a written copy of her oral testimony before the City Council and that a copy of the letter was submitted to each council member.

lawless manner". Reference is made to "six stables", but not to Chateau Stables by name.

Without answering, the CHAC defendants moved to dismiss the complaint for failure to state a cause of action, arguing, *inter alia,* that the statements at issue constitute protected opinion under State law or are not provably false and concern matters of public concern and, as such, are nonactionable and, on that and other grounds as well, constitutionally protected. The motion was supported by an affidavit from Dr. Cheever, in which she reviewed her qualifications and described her three inspections of Chateau Stables. Ms. Parker also submitted an affidavit in which she reviewed her efforts and those of CHAC in support of the passage of Local Law No. 89. Annexed to her affidavit was an extensive series of press excerpts, including editorials, letters to the editor and editorial cartoons, all commenting on the inhumane treatment of horses involved in the carriage trade and the disruption caused by the use of hansom cabs in city streets, the purpose of which was to show the issue as one of public interest. The ASPCA defendants cross-moved for the same relief, arguing, *inter alia,* that, with respect to Kullberg, plaintiffs failed to allege publication of the allegedly defamatory words in the January 4, 1989 letter sent to him and asserting this State's proscription against civil actions for conspiracy, absent an allegation of an underlying tort committed by the conspirators. In support of the motion, they submitted an affidavit from Mr. Kullberg in which he described the activities of the ASPCA in the effort to obtain humane treatment for carriage horses and in support of Local Law No. 89.

Gloria McGill submitted an affidavit in opposition, denying any abuse or mistreatment of Chateau Stables' animals and describing defendants' allegations as to the conditions found at six inspected stables as "lies" and part of a "campaign" to "destroy" the carriage horse trade in New York City. The affidavit is replete with claims of defendants' personal animosity toward plaintiffs and other members of the carriage horse trade. Plaintiffs also submitted affidavits from two veterinarians, who, without disputing the conditions Dr. Cheever found in her inspection and from which she drew her conclusions, disagreed only with her assessment that the horses were inhumanely treated.

The IAS court denied the motions, noting, "[A]ssuming the allegations set forth [in the complaint] to be true * * * plaintiffs have stated viable causes of action against the

defendants." Quite apart from any other deficiency as to certain of the causes of action, the complaint should have been dismissed in its entirety since the challenged statements are either constitutionally protected as assertions of fact on a matter of public concern, which have not been shown to be provably false, or protected opinion under New York State law.

The standards in determining a CPLR 3211 (a) (7) motion for dismissal for failure to state a cause of action are well known. *(See, e.g., 219 Broadway Corp. v Alexander's, Inc.,* 46 NY2d 506, 509.) Such a motion assumes the truth of the complaint's material allegations and whatever can be reasonably inferred therefrom. *(See, Foley v D'Agostino,* 21 AD2d 60, 65.) The motion should be denied if "from [the pleading's] four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law". *(Guggenheimer v Ginzburg,* 43 NY2d 268, 275.)

■ Applying that standard and without reference to extraneous facts, we find that at least some of plaintiffs' claims should be rejected. The eleventh cause of action, for instance, cannot stand as an allegation of interference with business relationships to the extent it purports to do so, since it makes only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship. What this cause of action does plead is the tort of civil conspiracy, which is not recognized in this State. *(See, Pelton Co. v Moundsville Shopping Plaza,* 173 AD2d 201; *Midtown Candy Co. v Helmsley-Spear, Inc.,* 160 AD2d 484.)

While there is no such tort as a conspiracy to libel *(Russo v Advance Publ.,* 33 AD2d 1025), allegations of conspiracy are allowed to show that the underlying tortious acts flowed from concerted action and to connect each defendant with an actionable injury. *(Danahy v Meese,* 84 AD2d 670, 672.) Thus, the allegation of conspiracy is allowed only to connect a defendant to an otherwise cognizable tort. *(Monsanto v Electronic Data Sys. Corp.,* 141 AD2d 514, 515.) The gravamen of the conspiracy is the underlying wrong and the resultant injury. *(Danahy v Meese, supra.)* In this regard, defendants' arguments as to the fatal deficiency of the eleventh cause of action as a claim for conspiracy are not well taken since, however couched, its assertions serve to tie the ASPCA defendants to the publication of the allegedly libelous leaflet. Thus, a libel is pleaded.

■ With the exception of the eleventh cause of action, plaintiffs fail to allege publication of any defamatory statement as to the ASPCA defendants. Of the remaining causes of action, only the second, which asserts that Kullberg "received * * * and read" an allegedly defamatory letter addressed to him, contains a defamation-based allegation against the ASPCA defendants. There cannot be a libel without publication. *(See, Church of Scientology v Green,* 354 F Supp 800, 803; *see also, Wells v Belstrat Hotel Corp.,* 212 App Div 366, 368.) The mere receipt of an alleged libelous statement does not establish libel on the part of the person who receives the statement. Thus, except for the eleventh cause of action, the complaint should be dismissed as against the ASPCA defendants, pursuant to CPLR 3211 (a) (7), for failure to state a cause of action.

■ While none of the other issues raised by defendants can be resolved on the face of the complaint or indeed by reference to the extrinsic facts offered by plaintiffs in support of the complaint *(see, Guggenheimer v Ginzburg, supra,* 43 NY2d, *supra,* at 275), defendants' CPLR 3211 (a) (7) motions can be converted to a request for summary judgment relief. Although the parties were never so notified by the IAS court, there is a recognized exception to the notice requirement "when both sides make it unequivocally clear that they are laying bare their proof and deliberately charting a summary judgment course". *(Four Seasons Hotels v Vinnik,* 127 AD2d 310, 320.) Both plaintiffs and the CHAC defendants have briefed this appeal on the repeatedly expressed assumption that the motion presented an issue for summary judgment resolution. As to the ASPCA defendants, implicit in their brief is the assumption that summary judgment is at issue and appropriate. Summary judgment is particularly useful in a libel case "since '[t]he threat of being put to the defense of [such] a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself' ". *(Karaduman v Newsday, Inc.,* 51 NY2d 531, 545, quoting *Washington Post Co. v Keogh,* 365 F2d 965, 968, *cert denied* 385 US 1011.)

■ As to their constitutional arguments, defendants argue, *inter alia,* that their statements are communications on a matter of public interest and thus entitled to a qualified privilege under the First Amendment to the United States Constitution and constitute protected opinion under New York State law. As the record makes clear, the treatment of car-

riage horses had been a matter of public concern and controversy in New York City well before January 4, 1989, the date of the first allegedly libelous statement. Extensive media coverage had been given to the working conditions and treatment of these horses. During the period from 1986 through 1989, when Local Law No. 89 was enacted, numerous editorials, articles, letters and television and radio programming discussed the subject. While plaintiffs suggest that defendants are not entitled to the protection of the public concern privilege because of their "extremist animal rights agenda", it is beyond dispute that it is the subject of the communication, not the particular viewpoint expressed, that determines whether a matter is of public concern. *(See, Gaeta v New York News,* 62 NY2d 340, 349; *see also, Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 200.)* Nor, for that matter, are the objectives of the party making the communication determinative.

■ In order to insure that debate on public issues remains "uninhibited, robust, and wide-open" *(New York Times Co. v Sullivan,* 376 US 254, 270), the Supreme Court has fashioned significant constitutional protections in this area. Where a private individual's [2] defamation action involves statements of public concern, the court has held that "the States could not impose liability without requiring some showing of fault * * * ('This approach * * * recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation')." *(Milkovich v Lorain Journal Co.,* 497 US 1, —, 110 S Ct 2695, 2704, quoting *Gertz v Robert Welch, Inc.,* 418 US 323, 347-348.) [3]

In New York, at least in the case of a media defendant, where the content of a false and defamatory publication " 'is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition' ", a libel plaintiff may recover damages "only on a

---

2. [5] We reject defendants' argument that plaintiffs are public figures because they have voluntarily involved themselves in an industry that is the subject of public controversy.

3. Where an allegedly defamatory statement on a matter of public concern is made concerning a public official *(New York Times Co. v Sullivan,* 376 US 254, *supra)* or public figure *(Curtis Publ. Co. v Butts,* 388 US 130, 164 [Warren, Ch. J., concurring]), it must be shown that the statement was made with " 'actual malice' " *(New York Times Co. v Sullivan, supra,* at 280), that is, with knowledge of its false content or implication or with reckless disregard of its truth.

showing of gross irresponsibility". *(Gaeta v New York News,* 62 NY2d, *supra,* at 345, quoting *Chapadeau v Utica Observer-Dispatch,* 38 NY2d, *supra,* at 199.) In *Philadelphia Newspapers v Hepps* (475 US 767, 776), the Supreme Court, in extending First Amendment protections, fashioned "a constitutional requirement" that where a plaintiff seeks damages against a media defendant for speech of public concern "the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages."

The Supreme Court has yet to resolve the question whether the First Amendment provides different standards of protection for the institutional media from those provided for nonmedia defendants. *(See, Philadelphia Newspapers v Hepps,* 475 US, *supra,* at 779, n 4; *Milkovich v Lorain Journal Co.,* 497 US, *supra,* at —, n 6, 110 S Ct, *supra,* at 2706.)* There is no reason, however, why the Constitution should be construed to provide greater protection to the media in defamation suits than to others exercising their freedom of speech; "it makes no sense to give the most protection to those publishers who reach the most readers and therefore pollute the channels of communication with the most misinformation and do the most damage to private reputation" *(Dun & Bradstreet v Greenmoss Bldrs.,* 472 US 749, 773 [White, J., concurring]), especially where the nonmedia defendant uses the media for the publication of matter claimed to be defamatory. *(Pollnow v Poughkeepsie Newspapers,* 107 AD2d 10, 16, *affd* 67 NY2d 778.) We note though that the New York gross irresponsibility standard may not always be apt in the case of a nonmedia defendant such as the CHAC defendants, who, in describing the conditions to which carriage horses were subjected, were reporting their own observations. On the other hand, the media, for the most part, must rely on the information provided by others. Thus, a standard which requires a showing that the publisher of defamatory material "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d, *supra,* at 199) is particularly suited to a media defendant. Whatever the applicable standard, as *Gertz* (418 US 323, *supra)* holds, there can be no liability without a showing of fault.

With respect to the letters and leaflets at issue, except for a de minimis dispute over the adequacy of the stall dimensions, plaintiffs have offered nothing to disprove any of

the factual assertions as to size and space configuration, temperature, the presence of urine puddles on the worn flooring and the sores and other specifically identified health problems or the like. For instance, plaintiffs do not dispute that the horses are kept in straight stalls (4 feet, 2 inches by 9 feet); they only disagree with Dr. Cheever's opinion that such stalls are too narrow. Similarly, they do not dispute that the horses are housed on the second floor of their facility, with a narrow ramp providing the only method of exit; they only disagree with Dr. Cheever's conclusion that such a condition is dangerous. Nor do they dispute that the horses are scarred or that they do not have constant access to water, they merely explain why the horses are scarred or do not require constant access to water. A reading of their veterinary experts' affidavits shows that they only disagree with defendants' conclusions that the accommodations are inadequate or that the horses' health is seriously at risk. Thus, plaintiffs have failed to raise any triable issue as to the falsity of the factual statements. Nor does the factual content of any of the foregoing assertions contain a provably false connotation. The thrust and tenor of the factual premises are explicit. Since the statements, which involve a matter of public concern, have not been shown to be provably false (see, Philadelphia Newspapers v Hepps, supra, 475 US 767), we conclude that they are not actionable without reaching the question of fault.

The remaining statements alleged to be factually actionable, namely, the disputed assertions that water and veterinary care are not "sufficient" and that the horses are housed under "unsafe, unhealthy, and inhumane conditions", constitute protected opinion under New York State law. In Immuno AG. v Moor-Jankowski (77 NY2d 235, cert denied — US —, 111 S Ct 2261), the Court of Appeals, on remand, following the Supreme Court's rejection in Milkovich of a separate constitutional protection for statements characterized as " 'opinion' " rather than "fact" (497 US, supra, at —, 110 S Ct, supra, at 2705, 2706),[4] noted that in many instances the protections afforded speech under the New York State Constitution are broader than those under the First Amendment of the Federal Constitution (supra, at 249) and reaffirmed the analysis contained in Steinhilber v Alphonse (68 NY2d 283, 289) that

---

4. According to Milkovich, a statement's defamatory character does not turn on whether the statement is one of fact or opinion but, rather, whether the statement carries a defamatory factual connotation that is provably false. (497 US, supra, at —, 110 S Ct, supra, at 2707.)

expressions of opinion are fully protected under State law. The *Steinhilber* court had cited four factors as determinative in separating protected opinion from actionable fact: whether the specific language at issue has a precise meaning readily understood or is indefinite and ambiguous; whether it is capable of being objectively viewed as true or false; consideration of the full context of the communication in which the statement is made; and consideration of the broader social context surrounding the communication, including the existence of any applicable customs or convention which might alert the reader that he or she is reading opinion and not fact *(supra,* at 292, citing *Ollman v Evans,* 750 F2d 970, 978-984). The *Immuno* court stressed that part of the *Steinhilber* analysis emphasizing the need to examine the full context of the challenged speech, rather than "[i]solating [it] and first extracting its express and implied factual statements", since the latter approach could easily result in "identifying many more implied factual assertions than would a reasonable person encountering that expression in context." (77 NY2d, *supra,* at 255.) This approach "accords with the central value of assuring 'full and vigorous exposition and expression of opinion on matters of public interest.' " *(Supra,* at 255, quoting *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 384, *cert denied* 434 US 969.)

In *Immuno,* which involved a letter written by the chairperson of an animal rights group to the editor of a scientific journal critical of a plan to establish a facility for hepatitis research using chimpanzees, the court noted that, by examining the context of the letter as a whole and the underlying controversy, "it would be plain to the reasonable reader * * * that [the writer of the letter] was voicing no more than a highly partisan point of view" and, by implication, was not making factual assertions. (77 NY2d, *supra,* at 255.)

The same analysis applies here. The reasonable reader of the allegedly defamatory statements—that the veterinary care was inadequate and that the horses were maintained under inhumane conditions—would recognize that they represented opinion, expressed as part of an ongoing controversy and designed primarily to persuade. No reasonable person reading the letters and leaflets in their entirety would find these conclusions to be anything other than highly partisan expressions of opinion by animal rights activists that the carriage horse trade was not providing adequate and humane treatment of its animals. Since, as *Immuno* noted, letters to the

editor give citizen advocates access to the media that they could not otherwise afford, and the dissemination of information to the general public and the expression of opinion by advocates on the basis of such information serves to encourage public debate *(supra,* at 252-253), which is crucial in environmental and animal protection matters, such communications, as *Immuno* held, should not be hypercritically scrutinized for the extraction of possible assertions of fact from what in context is a clear expression of opinion. *(Supra,* at 256.) Dr. Cheever's letters to the editors of the New York Times and 7 Days as well as Ms. Parker's letter to the editor of Horse World USA fall into that category. Since Dr. Cheever's letter in support of proposed Local Law No. 89 to the City Council describing the poor conditions to which carriage horses are exposed and Ms. Parker's letter of a similar nature to the Commissioner of the Department of Parks and Recreation, as well as the flyer, serve a similar function, we see no reason why the same standard should not be applied to them.

■ Accordingly, since the writings at issue are, in part, constitutionally protected as assertions of fact on a matter of public concern, which have not been shown to be provably false, or, as to the remainder, protected opinion under New York State law, the entire complaint should be dismissed. Defendants raise other constitutional arguments, as well as other claims, regarding the sufficiency of the complaint, the merits of which we need not reach in light of the foregoing. The only other issue remaining for consideration is defendants' request for sanctions, which the IAS court denied. In our view, sanctions are inappropriate in this case.

While sanctions for prosecuting a frivolous action are available to a defendant in a defamation action where application of the dispositive privilege is so obvious that the action is clearly without any basis in fact or law *(Grasso v Mathew,* 164 AD2d 476, 480, *lv dismissed* 77 NY2d 940, *lv denied* 78 NY2d 855), it is not enough that the action be meritless; it must be brought or continued in bad faith. (CPLR 8303-a [c] [ii].) What is required, in effect, is a showing that the plaintiff and counsel knew or should have known that the action lacked merit. *(Mitchell v Herald Co.,* 137 AD2d 213, 218-219.) None of plaintiffs' causes are so blatantly meritless as to justify sanctions. Nor can it be said that plaintiffs' lawsuit resulted in an improper use of the court's time. *(Cf., CCS Communication Control v Kelly Intl. Forwarding Co.,* 166 AD2d 173, 175.)

Defendants argue that sanctions are appropriate because

this case presents a clear example of a SLAPP (Strategic Lawsuits Against Public Publication) suit, i.e., a retaliatory action against individuals or organizations who actively participate in governmental decision making on issues of public interest. While it is apparent that this lawsuit is an outgrowth of the extreme animosity between the carriage horse trade and animal rights activists in New York City, there is no showing that it was brought in bad faith or to discourage plaintiffs' opponents from airing their views.

Accordingly, the order of the Supreme Court, Bronx County (Hansel McGee, J.), entered January 23, 1991, denying defendants' motions to dismiss the complaint and for attorneys' fees pursuant to CPLR 8303-a, should be modified, on the law, to grant the motion and cross motion to dismiss the complaint and, except as thus modified, affirmed, without costs or disbursements.

MILONAS, WALLACH, KUPFERMAN and ASCH, JJ., concur.

Order of the Supreme Court, Bronx County, entered January 23, 1991, which denied defendants-appellants' motions to dismiss the complaint and for attorneys' fees pursuant to CPLR 8303-a, is modified, on the law, to grant the motion and cross motion to dismiss the complaint and, except as thus modified, affirmed, without costs or disbursements.