OPINION OF THE COURT
Shirley Werner Kornreich, J.
Defendant Chartis Specialty Insurance Company moves to dismiss the complaint pursuant to CPLR 3211 (a) (1), (5) and (7). Defendant’s motion is granted in part and denied in part for the reasons that follow.
I. Factual Background and Procedural History
As this decision involves a motion to dismiss, the facts recited are taken from the complaint.
Plaintiff, CT Investment Management Co., LLC, through numerous transactions, is the successor in interest to the companies (such as Bear Stearns) that originally held the rights to the contracts described below. (Complaint HH 8-9.) On October 3, 2006, nonparty LaSalle Bank National Association loaned $103 million to numerous Mexican entities that own six hotels in Mexico (the Mexican borrowers). (H1Í 7-9.) LaSalle and the Mexican borrowers executed numerous contracts governing the transfer of the proceeds from the loan payments, including: (1) a cash management agreement (the CMA); (2) a dollar lockbox agreement (the DLA); and (3) a pesos lockbox agreement (the PLA). (1110.) The DLA and the PLA governed accounts located in the United States and Mexico, respectively, and funds in both accounts were swept into the account governed by the CMA, which is located in the United States. (H 11.) Nonparties Pablo Ignacio Gonzalez Carbonell and Grupo Costamex, S.A. de C.V, both affiliated with the Mexican borrowers, entered into a guaranty agreement with LaSalle whereby they guaranteed payment on the loan in the event of the Mexican borrowers’ bankruptcy. (If 12.)
*417 In conjunction with the loan, LaSalle purchased a political risk insurance policy from Chartis that was effective through October 11, 2012. (1i 13.) Article I of the policy sets forth that the policy provides coverage for two types of losses: (1) a loss “caused principally and directly by an Expropriatory Act”; and (2) a loss “resulting solely and directly from a condition of Currency Inconvertibility or Non-transfer.” (1Í1Í18, 20.) Under section 2.1 of the policy, an expropriatory act is defined as
“an act . . . whether characterized as expropriation, confiscation, nationalization, requisition, or sequestration by law, order, military or administrative action of the Government [defined in section 3.6 as ‘the present or any succeeding central governing authority or agency or authority acting on its behalf] of [Mexico] which:
“(a) prevents the Insured from receiving a Scheduled Payment from the Issuer; or “(b) permanently deprives the Issuer of its ability to control or dispose of all or part of its property or operate its business; or
“(c) causes the Issuer to fail to make a Scheduled Payment; or
“(d) effectively deprives the Insured of its fundamental right as a creditor in respect of all or part of a Scheduled Payment that is otherwise in default for commercial reasons, including rights against collateral security and/or commercial guarantees or repayment; or
“(e) effectively deprives the Issuer or the Insured of the use and control of funds . . . causing the Issuer to fail to make the Scheduled Payment . . . ; provided that such acts are violations of international law (without regard to the availability of local remedies) or, if purported to be in accordance with local law, such local law has been materially altered to permit the Expropriatory Act since the inception date of the policy; and that in either case such acts result in non-payment [for 120 consecutive days].” (U 19.)[1]
Under section 2.2 of the policy, a currency claim encompasses:
*418 “(a) any actions or series of actions by the [Mexican government] that prevents the Insured or the Issuer from directly or indirectly:
“(i) legally converting [pesos] received by or held for the account of the Insured or the Issuer into [U.S. dollars] in order to make a Scheduled Payment, including the denial of such conversion in an exchange rate category at least as favorable as the category applicable to determine the Reference Rate of Exchange [defined in section 3.20] or
“(ii) legally transferring outside of [Mexico] the amount of [U.S. dollars] which constitutes a Scheduled Payment; or
“(b) failure by the [Mexican government] to effect such conversion and/or transfer the funds on behalf of [the parties];” provided that
“(1) [the parties] at the beginning of the Policy Period can lawfully and freely transfer [U.S. dollars] to [the United States]; and
“(2) [the parties are] not successful in converting and transferring [pesos] into [U.S. dollars] for [120 consecutive days], provided that the [parties] have made all reasonable efforts to convert and/or transfer such currency in accordance with [Mexican law], through all customary channels that could have been reasonably utilized in the absence of this coverage; and
“(3) the first attempt to convert [or transfer pesos] ... to make a Scheduled Payment (or part thereof) was made on or within 30 days following the original due date of the Scheduled Payment.” (1i 21.)[2]
Section 4.12 provides that the policy does not cover losses “caused by or resulting from . . . insolvency, bankruptcy or financial default, except where such financial default is directly caused by an Insured Event.”
On April 27, 2010, Mr. Carbonell and Costamex (the signatories of the guaranty agreement) as well as nonparty Epsilon Impulsora y Administrativa, S.A. de C.V (another company related to the Mexican borrowers) held a “shareholders’ meeting” of Cozumel Caribe, S.A. de C.V (one of the Mexican borrowers), *419 during which they approved the filing of a petition (the concurso petition) for voluntary bankruptcy (known in Mexico as concurso mercantil) under the Mexican Business Reorganization Act (known in Mexico as Ley de Concursos Mercantiles). (1i 26.) Plaintiff contends that the vote was unauthorized and that Mr. Carbonell, Costamex, and Epsilon lacked the authority to commence the bankruptcy proceeding. (Id.)
On May 21, 2010, Cozumel filed the concurso petition in the Third District Court in the Mexican State of Quintana Roo. (11 27.) The concurso petition sought injunctive relief barring enforcement of the Mexican borrowers’ loan and the guaranty agreement. (Id.) On May 27, 2010, the Quintana Roo District Court issued an ex parte order granting the requested injunctive relief. (11 28.) Plaintiff contends that the Quintana Roo District Court lacked the statutory authority to apply the injunction against any party other than the petitioner (i.e., the other Mexican borrowers and the guarantors).[3] (Id.) The May 2010 order caused a scheduled payment to be missed, and a notice of default was issued on June 25, 2010. (11 30.)
On August 12, 2010, plaintiff commenced an amparo action (a proceeding alleging a constitutional violation) in the Second District Court of the City of Cancún, seeking a stay of the May 2010 order. (If 33.) The Cancún District Court denied plaintiffs motion, which was affirmed by the Second Associate Court of the Twenty-Seventh Circuit in Mexico, which then dismissed the amparo action. On August 30, 2010, the security trustee and majority shareholder of Cozumel (BAM) voted to adopt a resolution to withdraw the concurso petition, and a withdrawal petition seeking such relief was filed in the Quintana Roo District Court on September 3, 2010. (If 34.) On September 7, 2010, the Quintana Roo District Court denied the withdrawal petition. (Id.) On September 30, 2010, the Quintana Roo District Court declared Cozumel to be in concurso mercantil. (If 36.) On November 11, 2010, nonparty Nemias Estaban Martinez Martinez was appointed as mediator for the mediation stage of Cozumel’s bankruptcy proceeding (similar to a chapter 11 proceeding), which commenced on April 1, 2011. (1111 37, 39.) The mediation stage ended on October 3, 2011, without a reorganization of Cozumel. (11 40.) On October 4, 2011, BAM filed a mo *420 tion in the Quintana Roo District Court to declare the bankruptcy of Cozumel. (If 41.) On October 5, 2011, the Quintana Roo District Court refused to declare the bankruptcy of Cozumel. (Id.) Thus, given that the bankruptcy proceeding appeared to be over without a reorganization or liquidation, BAM filed further motions to revoke the May 2010 order, all of which were denied. (¶¶ 42-43.)
In September 2010, while the bankruptcy proceedings were occurring in Mexico, plaintiff sent Chartis regular updates on the proceedings. (¶ 48.) On February 22, 2012, plaintiff formally filed a claim under the policy through its insurance broker, Aon Crisis Management, which stated that the “Date of Loss” should be determined as of December 30, 2011 (the date that the final motion to vacate the May 2010 order was denied). (¶¶ 42, 50.) On March 26, 2012, Chartis sent a letter to Aon requesting a formal “proof of loss” within 30 days, which Aon responded to on April 26, 2012. (¶¶ 52-53.) On May 3, 2012, Chartis sent Aon a letter denying coverage for plaintiffs loss. (¶ 54.) On June 1, 2012, Aon responded that the denial of coverage was improper. (¶ 55.) On June 22, 2012, Chartis sent a letter to Aon reasserting its denial of coverage but requested further documents substantiating plaintiffs claims so that it could conduct an investigation into the Mexican proceedings. (¶ 56.) On September 13, 2012, Chartis sent a letter to Aon indicating that is was ending its investigation because the policy was set to expire on October 11, 2012, but reserved its right to request further information about plaintiffs claims. (1Í 56.) This action followed.
Plaintiff filed the complaint on November 13, 2012, asserting claims for: (1) declaratory relief as to its right to recover under the policy; (2) breach of contract based on an expropriatory claim; and (3) breach of contract based on a currency claim. This was the third action commenced in New York relating to the Mexican proceedings. On January 11, 2012, Judge Sweet extended comity to the May 2010 order and stayed plaintiffs lawsuit to enforce the guaranty agreement that was commenced in the United States District Court for the Southern District of New York. (See CT Inv. Mgt. Co. v Carbonell, 2012 WL 92359, 2012 US Dist LEXIS 3356 [SD NY, Jan. 11, 2012, No. 10 Civ 6872].) On November 14, 2012, Judge Glenn stayed a Bankruptcy Code (11 USC) chapter 15 adversary proceeding relating to the funds in the accounts governed by the CMA and DLA and ordered the parties to seek clarification in the Quintana Roo District Court on the precise impact of the May 2010 order. (See *421 In re Cozumel Caribe, S.A. de C.V., 482 BR 96 [SD NY 2012].) For the reasons discussed herein, this court follows the lead of the federal district and bankruptcy courts, stays this action, and directs the parties to conduct an investigation into the status of the proceedings in the Quintana Roo District Court.
The court will not rule on whether plaintiffs currency claim is precluded by the policy’s bankruptcy exclusion until the stay is lifted. Nonetheless, the court disposes of the expropriatory claim and Chartis’ other defenses on documentary evidence grounds.
II. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. (Skillgames, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if “the documentary evidence utterly refutes plaintiffs factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
A. The Expropriatory Claim
Plaintiffs expropriatory claim is based on the theory that the Quintana Roo District Court altered Mexican law by issuing an injunction that impacted parties beyond the scope of that court’s statutory jurisdiction. Chartis contends that Mexican law has not been “altered” merely by virtue of a judicial ruling. Instead, Chartis avers that the Quintana Roo District Court’s ruling was *422 a mere interpretation of Mexican law and that even if such interpretation was erroneous, it was not an alteration of the law, especially because in Mexico, a civil law jurisdiction, judicial decisions carry no precedential value due to the rejection of the principle of stare decisis.
Judicial error by a trial level judge does not “alter” the law, especially where, as here, the Quintana Roo District Court’s ruling has no precedential value. Political risk insurance is usually understood to cover actions by a foreign legislative body (such as passing a new law) or executive figure (such as nationalizing a private company). Unfavorable judicial decisions are a different sort of risk. Under plaintiff’s theory, every judicial decision would be subject to an expropriatory claim on the ground that it alters the law in some way. If the parties had desired to insure against this broad risk, the policy would have expressly provided so. Therefore, the court rejects plaintiff’s contention that the Quintana Roo District Court’s allegedly erroneous ruling constitutes a change in Mexican law and the ex-propriatory claim is dismissed.[4]
B. The Currency Claim
Plaintiff has sufficiently alleged the elements of a currency claim because the May 2010 order constitutes an act by the Mexican government that prevents the Mexican borrowers from transferring money owed under the loan to plaintiffs accounts in the United States. The court rejects Chartis’ arguments that (1) attempting a futile (and illegal) transfer of funds in contravention of the May 2010 order is a condition precedent to maintaining a currency claim; and (2) plaintiff needs to allege a prohibition on transferring a specific amount of funds, rather than a prohibition on transferring a specific category of funds. Moreover, Chartis’ documentary evidence is insufficient to demonstrate that plaintiffs proof of loss is defective or that its claims are not timely. However, Chartis’ argument that plaintiffs currency claim is barred by the bankruptcy exclusion merits serious consideration.
*423 The point of contention is whether plaintiffs loss was caused by “insolvency, bankruptcy or financial default.” Chartis has not submitted any evidence of the Mexican borrowers’ insolvency or default. Instead, Chartis argues that the policy does not cover plaintiffs loss because the loss was caused by the May 2010 order, which was issued in a bankruptcy proceeding. Ergo, Chartis contends, the loss was caused by bankruptcy. Indeed, as discussed, supra, in part I, two federal judges have concluded that comity should be afforded to the Mexican bankruptcy proceeding. This court agrees.
Nonetheless, the fact that the loss was caused by a “bankruptcy court order” does not mean that the loss was caused by bankruptcy. Based on the record and the parties’ representations during oral arguments, no one knows if there is a currently pending proceeding in which Cozumel is actually being reorganized or liquidated. Judge Glenn was uncertain about the status of the May 2010 order and the proceedings in the Quintana Roo District Court. (See In re Cozumel Caribe, 482 BR at 117-118.) Furthermore, at oral arguments held on April 16, 2013, the parties admitted that they were not certain about what has transpired in the Mexican proceedings and did not know the status of a recent order by the Mexican Supreme Court that might lead to a reorganization proceeding. (See tr at 8-9 [“there’s no question exactly what happened (is) murky”].) If Cozumel is either reorganized or liquidated in such a way that prevents plaintiff from receiving the loan proceeds, its losses will be caused by bankruptcy and would not be recoverable under the policy. However, it is unclear what is happening in Mexico.
Consequently, the court denies Chartis’ motion to dismiss the currency claim without prejudice. Discovery in this action is stayed until the parties conduct an investigation into the status of the proceedings in Mexico. After such investigation is conducted, Chartis may renew its motion to dismiss the currency claim if it can present evidence that Cozumel was actually reorganized or liquidated. If so, there would be no coverage, because plaintiff purchased political risk insurance, not bankruptcy insurance. If the May 2010 order is lifted by the Quintana Roo District Court or vacated by a higher court, plaintiffs claim may be moot because plaintiff may resume enforcing the loan against the Mexican borrowers or their guarantors. In that event, there would be no loss. Finally, if the May 2010 order permanently prevents plaintiff from collecting on the loan and *424 there is no bankruptcy or liquidation, there may well be a claim. Accordingly, it is ordered that the motion to dismiss the complaint by defendant Chartis Specialty Insurance Company is granted in part, and the second cause of action (the expropriatory claim) is dismissed without prejudice and the motion is otherwise denied without prejudice; and it is further ordered that the parties are directed to conduct an investigation into the Mexican proceedings in accordance with this decision, and discovery is stayed in the interim; and it is further ordered that the parties are to appear in Part 54, Supreme Court, New York County, 60 Centre St., room 228, New York, NY, for a preliminary conference on August 27, 2013 at 10:00 in the forenoon, and, by August 20, 2013, the parties are directed to submit (by e-filing and fax) a joint report (not to exceed five double spaced pages) on the status of the Mexican proceedings and the two federal actions discussed herein; and it is further ordered that the parties shall promptly inform the court of any developments in the Mexican proceedings or the related federal actions that impact this case.

. In laymen’s terms, the Mexican government did something to prevent the lender from collecting its loan payment that would have been illegal at the time the policy was issued, but, through a subsequent change in the law, became legal in Mexico.

. In laymen’s terms, the Mexican government did something to prevent the borrower from transferring money from its account in Mexico to the lender’s account in the United States.

. The concurso petition was brought by Mr. Carbonell and Costamex, who both signed the guaranty agreement to insure payment on the loan in the event of bankruptcy, yet commenced a bankruptcy proceeding to vitiate their obligations under the guaranty agreement.

. It should be noted that even if the policy covered judicial error, it is not clear that the May 2010 order contravened Mexican or United States law. In fact, Judge Sweet noted that “U.S. bankruptcy courts have, as the [May 2010 order] does, suspended actions against non-debtor parties in order to assist in, and maintain the integrity of, the administration of a debtor’s bankruptcy case.” (CT Inv., 2012 WL 92359, *5, 2012 US Dist LEXIS 3356, *14, citing numerous examples, including Sec. Investor Prot. Corp. v Bernard L. Madoff Inv. Sec. LLC, 443 BR 295, 316-317 [SD NY 2011].) That being said, corruption is another matter and is a classic form of expropriation that political risk insurance was created to address.