OPINION OF THE COURT
Shirley Werner Kornreich, J.
Defendant DB Structured Products, Inc. (DBSP) moves to dismiss the complaint pursuant to CPLR 3211 (a) (1), (3), (7), and (8). Defendant’s motion is denied for the reasons that follow.
I. Factual Background and Procedural History
This case concerns DBSP’s alleged breach of its contractual obligation to repurchase certain nonconforming loans that were pooled, deposited into a trust, securitized, and sold to investors. Since this action arises from contractual obligations under a trust with a “no-action clause,” the trustee, HSBC Bank USA, National Association, filed the complaint on behalf of a certificateholder (plaintiff ACE Securities Corp.) (ACE) in the subject trust (Home Equity Loan Trust, Series 2006-SL2) (the trust). As this decision involves a motion to dismiss, the facts recited are taken from the complaint.
The loans at issue in this case were purchased by DBSP from at least three originators and then sold to ACE in a mortgage loan purchase agreement dated March 28, 2006 (the MLPA). (Complaint HIT 2-3.) Following the usual protocol for creating residential mortgage-backed securities, ACE deposited the loans into the trust. (If 4.) The loans were securitized through the issuance of over $500 million of certificates pursuant to a pooling and servicing agreement dated as of March 1, 2006 (the PSA). (Id.) In the MLPA, DBSP made over 50 representations and warranties (the representations) regarding the characteristics and quality of the loans, including those common in many MLPAs (e.g. representations about underwriting guidelines such as the borrower’s income and loan-to-value ratio) and those that are somewhat rarer (e.g. a “no-fraud representation”).[1] (IfIT 5-6.) Under section 2.03 of the PSA, DBSP was obligated to *564 cure a breach of a representation within 60 days of discovery or receipt of notice thereof, or, in the event that such breach could not be cured, DBSP had to repurchase the affected loans within 90 days at a defined purchase price. (H 26.) Both the PSA and the MLPA provide that the repurchase protocol is the “sole remedy” with respect to loan losses caused by false representations.
On March 28, 2012, this action was commenced by two certificateholders (RMBS Recovery Holdings 4, LLC and VP Structured Products, LLC) by filing a summons with notice. A single cause of action alleging breach of contract was stated. It is undisputed that these certificateholders lacked standing to maintain this action under the PSA’s no-action clause. They did so, apparently, due to concerns over their claims being time-barred, a worry amplified by the trustee’s initial refusal to sue on their behalf. Ultimately, the trustee was substituted as the plaintiff for the certificateholders. As discussed infra, the manner in which this action was originally commenced, in the end, is not at issue because the relevant statute of limitations did not expire before the substitution.[2]
II. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [1st Dept 2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. (Skillgames at 250, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d at 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune- *565 N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if “the documentary evidence utterly refutes plaintiff’s factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002] [citation omitted]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
A. Statute of Limitations
Pursuant to CPLR 213 (2), breach of contract claims are subject to a six-year statute of limitations. (Mendelsohn v City of N.Y. [19th Precinct], 89 AD3d 569 [1st Dept 2011].) The claim accrues at the time of breach, even if plaintiff does not suffer damages until a later date. (Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 402 [1993].) “[K]nowledge of the occurrence of the wrong on the part of the plaintiff is not necessary to start the Statute of Limitations.” (Id. at 403, quoting Varga v Credit-Suisse, 5 AD2d 289, 292 [1st Dept 1958].) Additionally, CPLR 206 (a) provides that “where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete.” (Parker v Town of Clarkstown, 217 AD2d 607, 608 [2d Dept 1995].) “However, where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring up to six years prior to filing of the suit.” (Airco Alloys Div. v Niagara Mohawk Power Corp., 76 AD2d 68, 80 [4th Dept 1980], citing Bulova Watch Co. v Celotex Corp., 46 NY2d 606 [1979]; see also New York Cent. Mut. Fire Ins. Co. v Glider Oil Co., Inc., 90 AD3d 1638, 1642 [4th Dept 2011] [“Where, as here, a contract provides for a recurring obligation, a claim for damages accrues each time the contract is allegedly breached”]; Beller v William Penn Life Ins. Co. of N.Y., 8 AD3d 310, 314 [2d Dept 2004] [same]; Guilbert v Gardner, 480 F3d 140, 150 [2d Cir 2007] [same].)
DBSP argues that plaintiff’s claim for breach of the PSA accrued when the contract was executed in 2006. It argues that if the representations were false, they were false in 2006 since the mortgage loans had already been made. Plaintiff disagrees and argues that its claims did not accrue until DBSP breached its repurchase obligations (which, regardless of the exact date of accrual, would be within six years of the date the complaint was filed).
*566 In 2003, well before the financial crisis and subsequent flurry of mortgage-backed securities litigation, a federal district court dealt with this exact situation. (See Structured Mtge. Trust 1997-2 v Daiwa Fin. Corp., 2003 WL 548868, 2003 US Dist LEXIS 2677 [SD NY, Feb. 25, 2003, No. 02 Civ. 3232(SHS)] [Daiwa].) In Daiwa, the court held that the claim accrued when the PSA was executed because the subject representations “were not true when made” and that the trustee could have made a repurchase demand at that time. (2003 WL 548868, *2, 2003 US Dist LEXIS 2677, *5.) Consequently, Daiwa held, the statute of limitations runs from the execution of the contract because the claim accrues “when the wrong is committed, and not when the plaintiff discovers it.” (2003 WL 548868, *2, 2003 US Dist LEXIS 2677, *6, citing Joseph McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 206 [1990 ed].) For the reasons discussed below, this court disagrees with the Daiwa holding. CPLR 206 (a), the “continuing performance” doctrine, and the nature of the parties’ relationship under the PSA militate against Daiwa.[3]
Under CPLR 206 (a), “ ‘demand is complete’ [means] that the Statute of Limitations runs from the time when the party making the demand first becomes entitled to make the demand, and not from the time the actual demand is made.” (Woodlaurel, Inc. v Wittman, 199 AD2d 497, 497-498 [2d Dept 1993] [emphasis added].) In section 2.03, as in other similar PSAs entered into by DBSR three steps must be followed before the trustee can sue DBSP for breach of its repurchase obligations: discovery or receipt of notice by the bank, cure, and repurchase. The trustee is not entitled to sue or make a repurchase demand until discovery or notice by the bank occurs and the cure period lapses. It, therefore, follows that DBSP does not breach the PSA and the claim for the breach does not accrue until DBSP fails to timely cure or repurchase a loan. Though DBSP characterizes a representation as being “breached” if it is false, in this contract action, the mere fact that a representation is false does not mean that DBSP “breached” the PSA. Under the PSA, DBSP has no duty to ensure that the representations are true. Thus, upon discovery or notice of falsity, DBSP’s obliga *567 tion is to follow the repurchase protocol. Whatever due diligence DBSP conducted was a matter of its sole discretion. If DBSP knew of or recklessly disregarded signs that the representations were false, it did so at its own peril because of its potential liability to the trustee under section 2.03. In sum, the only contractual wrong that DBSP could commit is failure to abide by section 2.03.
This notion is further reinforced by section 7 (a) of the MLPA, which sets forth that the trustee’s right to enforce DBSP’s repurchase obligations “shall not be impaired” by the trustee’s failure to review the loan files or conduct any due diligence on the veracity of the representations. The whole point of how the MLPA and PSA were structured was to shift the risk of noncomplying loans onto DBSP The representations and the repurchase protocol functioned as insurance for the trustee and the loans were likely priced accordingly. Consequently, to contend, as the Daiwa court and DBSP do, that the trustee’s claims accrued in 2006 because the trustee could have made a demand at that time utterly belies the parties’ relationship and turns the PSA on its head. If this were the case, the contracts, which include specific deadlines for the demand and cure period and involve loans with a 30-year term, could have stated that “repurchase demands can only be made within six years of the PSA’s execution.” It is highly peculiar that the PSA would leave out an effective six-year statute of repose if such a limitations period were actually contemplated by the parties. Furthermore, if such a limitations period existed, the trustee would have an implied duty to conduct constant due diligence on the veracity of the representations to ensure that lies are ferreted out before the time to make a repurchase demand expires. It is not commercially reasonable to read this obligation into the PSA because it is squarely at odds with section 7 (a) of the MLPA. Instead, DBSP has a “recurring obligation” under the PSA to follow the repurchase protocol when it is informed of a problem with a representation. (See New York Cent. Mut. Fire Ins. Co., 90 AD3d at 1642.) DBSP commits an independent breach of the PSA each time it fails to abide by and fulfill its obligations under the repurchase protocol, and “each breach may begin the running of the statute [of limitations] anew.” (Airco Alloys, 76 AD2d at 80.)
It should be noted that the instant case bears a resemblance to reinsurance, where the insurance company is often contractually obligated to make a demand on its reinsurer when it pays *568 out a claim to the underlying insured. The United States Court of Appeals for the Second Circuit, applying New York law, has held that a reinsurer does not breach its obligations to the insurance company until the reinsurer rejects the insurance company’s demand. (See Continental Cas. Co. v Stronghold Ins. Co., Ltd., 77 F3d 16 [2d Cir 1996].) Though the reinsurer’s contractual liability stems from the insurance company’s claim payment to the insured, “the reinsurers were not in ‘breach’ of their contract to indemnify until they rejected the demand.” (Id. at 21.)
The statute of limitations began to run when DBSP improperly rejected the trustee’s repurchase demand. Ergo, the breach is the failure to comply with the demand. Of course, plaintiff cannot “put off the running of the Statute of Limitations indefinitely” by waiting an unreasonable time to make the demand. (Id., citing Snyder v Town Insulation, 81 NY2d 429, 435 [1993].) Had the trustee not made its demand in 2012 and instead waited a number of years to file suit, the inquiry might be different. However, not only did the trustee file suit shortly after making demand, DBSP actually contends (as discussed below) that this action was commenced too quickly. In conclusion, plaintiff’s claims did not accrue on the date of the contracts’ execution. Hence, the claims are timely.
B. The Repurchase Protocol
The court rejects DBSP’s arguments that the trustee’s supposed failure to comply with the repurchase protocol’s conditions precedent to bring suit precludes its claims. First, the trustee’s alleged failure to wait the requisite time to bring suit is irrelevant given DBSP’s repudiation of its repurchase obligations under the PSA. Next, waiting to cure is utterly pointless because the alleged false representations cannot be cured since most, if not all of the loans, have defaulted. Finally, the trustee’s failure to set forth which of the specific loans are affected by false representations is not fatal to the complaint because CPLR 3016 (b)’s particularity requirements do not apply to a breach of contract claim. Unlike similar cases, plaintiff does not allege fraud. Nonetheless, given the specificity requirements in the repurchase protocol, the specific identification of which loans have been affected by false representations is fair game for interrogatories.
As for DBSP’s contention that the PSA’s damages calculation prohibits recovery by the trustee, questions of fact clearly preclude dismissal on this ground. Even if DBSP were correct *569 that released, charged off, and liquidated loans are not subject to repurchase, dismissal would still not be warranted because DBSP needs to establish that all of the nonconforming loans fell into these defined categories. Discovery is necessary to make these determinations.
That being said, DBSP’s argument that loans in these categories are not subject to repurchase because they are no longer assets of the trust (or that their defined purchase price is now $0) is unconvincing. If DBSP were correct, it would be perversely incentivized to fill the trust with junk mortgages that would expeditiously default so that they could be released, charged off, or liquidated before a repurchase claim is made. Indeed, if DBSP learned that loans were nonconforming and played a crafty game of accounting by moving them off the trust’s books to their own to evade their repurchase obligations, such actions would be a breach of the duty of good faith and fair dealing. Consequently, it is to no avail to contend that the nonconforming loans are long gone and the trustee’s repurchase rights have been extinguished by DBSP’s actions.
Stepping back, it is worth keeping in mind that DBSP does not bear the risk of loss on all loans that default. Conforming loans, where the representations are true, will sometimes default for reasons that have nothing to do with borrowers lying or underwriter fraud. If “good” mortgages did not have real default risk, mortgage interest rates would be even lower than their current historically depressed levels. In reality, borrowers will occasionally default due to myriad unexpected circumstances, such as losing their job. In those cases, the certificate-holders bear the risk of loss and their recovery is limited to whatever proceeds can be obtained through foreclosure. In contrast, where, as here, borrowers allegedly defaulted due to the representations being false, such risk is meant to be borne by DBSP If, as DBSP contends, the certificateholders’ recovery on misrepresented loans is limited to foreclosure proceeds, the repurchase remedy would be virtually worthless.
Additionally, DBSP’s contention that it cannot “repurchase” a loan because the loan technically does not “exist” after foreclosure, misses the point. Foreclosure is not an alternative means of recovery for nonconforming loans; it is a setoff to DBSP’s obligation to pay back the cost of the loan. The PSA’s damages calculation includes foreclosure proceeds because the repurchase protocol is a mechanism whereby the certificate-holders can recover the cost of the loan minus the revenue *570 generated (which includes pre-default mortgage payments and foreclosure proceeds).
Nonetheless, DBSP correctly maintains that any recovery under section 2.03 must be limited to the formula set forth in the PSA. Therefore, if sampling is to be used as a means to calculate damages, the parties must come up with a sampling mechanism that meaningfully reflects the PSA’s damages calculation. The parties may not disregard such calculation in an attempt to seek complete rescission of the PSA merely out of frustration that being bound by the strict terms of the contract is laborious and inconvenient. The degree to which bargained for remedies are simple or convoluted is a matter for sophisticated commercial actors to address before the execution of a contract. It is not something to complain about in subsequent litigation. Accordingly, it is ordered that the motion to dismiss the complaint by defendant DB Structured Products, Inc. is denied.

. These representations have been the subject of much litigation involving both investors and monoline insurers. As this decision does not concern substantive disputes over the details of the representations, the court will not *564 provide further background and assumes familiarity with the recent line of similar cases in this court.

. Ergo, the dispute over whether the summons tolled the statute of limitations is moot.

. In 2011, another federal court made the same ruling as the Daiwa court, though did not cite to Daiwa. (See Lehman Bros. Holdings, Inc. v Evergreen Moneysource Mtge. Co., 793 F Supp 2d 1189, 1193-1194 [WD Wash 2011].) This court also considers that case to be a misapplication of New York law.