Urban Soccer Inc., Plaintiff,

against
Royal Wine Corporation, Defendant.


161186/2015

Trachtenberg Rodes & Friedberg LLP, for plaintiff.
Snitow Kanfer & Holtzer, LLP, for defendant. 


Shirley Werner Kornreich, J.

Defendant Royal Wine Corporation (Royal) moves (1) pursuant to CPLR 3211, to dismiss the complaint; and (2) for sanctions due to the complaint's supposed frivolity. Plaintiff Urban Soccer Inc. (Urban) opposes the motion. For the reasons that follow, Royal's motion to dismiss is granted and sanctions are denied.
I. Factual Background & Procedural History
As this is a motion to dismiss, the facts recited are taken from the complaint (see Dkt. 2)[FN1]
and the parties' documentary evidence and supplemental submissions.[FN2]
Royal is a producer, importer, and distributor of alcoholic beverages. In July 1999, Royal leased a warehouse in Brooklyn (the Premises) for a ten-year term from the City of New York (the City or NYC). See Dkt. 10 (the Lease). The Lease requires the City's consent to any sublease. In late 2014, Royal vacated the Premises and moved its operations to New Jersey. On June 1, 2015, Royal entered into a sublease (the Sublease) with Urban, the plaintiff in this action. See Dkt. 8 at 2.[FN3]
The Sublease is governed by New York law, contains a merger clause, and prohibits oral modifications. See id. at 27, 29-30. It states that it was the product of arms' length negotiations and that the parties were represented by independent counsel. See id. at 29.[FN4]
Urban, a New York based subsidiary of a French company, sought to construct and operate an indoor soccer facility on the Premises. Section 2.3(B) of the Sublease provides:
This Sublease is subject to NYC Consent. Promptly after this Sublease is executed by Royal, Urban shall make written application to NYC to obtain NYC's Consent and submit all documents requested by NYC to obtain NYC Consent. Royal agrees to cooperate and submit such documents as may be requested by NYC. If NYC Consent is not received within sixty (60) days after Royal delivers the executed Sublease to Urban, Royal has the right, in its sole discretion, to terminate this Sublease at which point the Security Deposit and the original Guaranty shall be immediately returned to Pierre Abitbol, Esq., [Urban's attorney], and the parties shall not have any rights as against the other.
See Dkt. 8 at 4 (emphasis added). Section 2.3(D) states that "Urban and Royal shall promptly deliver to the other a copy of any notice, requestor demand it receives from NYC or from any governmental agency or authority which relates to the Premises or the use or occupancy thereof.
See id. (emphasis added). Under section 5.2(i), the Sublease "shall be null and void" if the City does not provide consent. See id. at 7.
Section 6.1(B) of the Sublease obligates Royal to:
promptly execute and deliver such certificates, affidavits, or other instruments as may be required by Tenant or NYC, to enable Tenant to obtain approval from NYC to the terms and conditions herein including with respect to Tenant's Initial Work (including permits therefor), Tenant's obtaining a certificate of occupancy for the Premises, or Tenant's performance of repairs to the Premises. See id. at 8.
Section 12.1, entitled "Security Deposit", provides: 
Upon execution of this Sublease and as security for the faithful performance by Tenant of all of the terms and conditions upon the Tenant's [i.e., Urban] part to be performed, Urban shall deposit [$638,863.50] with Royal as security hereunder. The Security Deposit shall be maintained in a segregated interest-bearing account for the benefit of Tenant. If Tenant defaults with respect to any provision of this Sublease, including, but not limited to the provisions relating to the payment of Rent, Royal may (but shall not be required to) use, apply or retain all or any part of the Security Deposit for the payment of any Rent or any other sum in default, or for the payment of any amount which Landlord [i.e., Royal] may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If Tenant faithfully performs every provision of this Sublease to be performed by it, the Security Deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days after the expiration of the lease term. See id. at 17 (emphasis added).
The parties subsequently executed a rider to the Sublease (the Rider):
1. Article 2.3 B is hereby modified and amended as follows:
This Sublease is subject to NYC Consent. Promptly after this Sublease is executed by Royal and delivered to Urban, Urban shall deliver written application to NYC to obtain NYC Consent and submit all documents requested by NYC to obtain NYC Consent. Royal agrees to cooperate and submit such documents as may be requested by NYC. If NYC Consent is not received within five (5) months of [Royal's] delivery of the executed Sublease to Urban (said five-month term being coterminous with the five-month term in Article 4.3), Royal has the right, in its sole and absolute discretion, to terminate this Sublease and retain the Security Deposit as a fee for Royal having refrained from offering the Premises for [*2]sublease to another party and having not received any rent during the five (5) month period. If this Sublease is terminated as provided for herein, Royal shall return the original Guaranty to [Abitbol] and neither party shall have any further rights as against the other under the Sublease or Guaranty.
2. Except as provided for in this Rider, the Sublease remains unmodified and
in full force and effect. See id. at 35 (emphasis added).
Urban immediately reached out to the City to procure consent. The City, however, refused to discuss the matter with anyone other than its lessee, Royal. On June 8, 2015, Patrick Thrasher, an Assistant Vice President at the New York City Economic Development Corporation (EDC), advised Urban's architect that EDC would only communicate with Royal. By letter dated June 12, 2015, Thrasher wrote to David Herzog, the CEO and President of Royal:
[EDC], as Lease Administrator of the [Premises], writes in regard to the Lease Agreement ("Lease") for the Premises, dated as of July 1, 1999, as amended.
Based upon a visual observation of the Premises on or about June 8, 2015, it appears that [Royal], Tenant of the Premises ("Tenant"), has vacated the Premises. Further, third parties [i.e., Urban] unaffiliated with [Royal] have contacted [EDC] to inquire about building permits. Because of the apparent vacancy and these inquiries, we write to remind you that the Premises are use-restricted, pursuant to the Lease.
Article 9 ("Use of Premises") of the Lease provides that Tenant shall use and occupy the Premises "for the storage and distribution of food products, (crackers, canned goods, soups) and alcoholic beverages, for activities directly related to the storage and distribution of food products and alcoholic beverages, for related office uses and for no other purpose." It further provides, "Tenant shall not use the Premises or permit the Premises to be used for any other purpose except with the prior written approval of Landlord to be given at Landlord's sole discretion.["]
Article 14 ("Assignments, Subleases and Transfers") of the Lease conditions assignments, subleases, transfers and other actions by the Tenant upon the prior written consent of the Landlord (City of New York). Furthermore, if Landlord consents to any assignment, sublease transfer or other action as set forth in Article 14, Landlord may impose any conditions to its consent that Landlord determines, in its sole reasonable discretion, may be necessary or appropriate, including that the terms, covenants and conditions of the Lease become applicable to any Person (as defined in the Lease) to whom the provisions of Article 14 apply.
The Premises is located within an M3-1 zoning district. M3 districts are "Heavy Manufacturing Districts" (see Section 42-13 of the New York City Zoning Resolution.). M3 districts are generally designated for areas with heavy industries that generate noise, traffic or pollutants. Only certain uses are allowed within M3 districts, as set forth in the New York City Zoning Resolution ("Zoning Resolution"). A zoning change to permit uses not permitted by Article IV, Chapter 2 of Zoning Resolution can only be achieved through the Uniform Land Use Review Procedure (ULURP). ULURP is a standardized procedure set forth in the New York City Charter whereby applications affecting land use are publicly reviewed. The Charter also establishes mandated time frames within which application review must take place. Key participants in the ULURP process are the Department of City Planning (DCP) and the City Planning Commission, Community Boards, the Borough President, and the City Council. To date, the uses about which [EDC] has [*3]received inquiries do not conform to the use provisions of the Lease.
Please inform us of your intentions regarding the Premises as soon as possible. See Dkt. 11 (the June 12 Letter) (emphasis added).
According to his July 8, 2016 affirmation, on June 15, 2015, Royal's counsel, Kenneth Kanfer, called Thrasher to discuss the June 12 Letter. See Dkt. 34 at 3. Kanfer claims that "Thrasher was perturbed that [Urban] had prematurely approached the EDC about subleasing the premises before the EDC was presented with a proposed Sublease." See id. Kanfer states that he informed Thrasher about the Sublease and that it was subject to the City's consent. See id. According to Kanfer, "Thrasher requested that I provide him with the Sublease and a letter explaining the highlights." See id. at 4. Kanfer claims that immediately after his call with Thrasher, he called Abitbol, "read the June 12 Letter to him",[FN5]
and informed him of his conversation with Thrasher. See id. (emphasis added). According to Kanfer, [a]t the end of the call, we agreed that since I had spoken to [] Thrasher, I would promptly draft a letter to [] Thrasher which, for the first time, would include the Sublease as well as other materials that were requested." See id. 
Immediately thereafter, Kanfer and Abitbol began collaborating on a written response to Thrasher. See Dkt. 35 at 2-3 (email exchange). Indeed, Abitbol expressly approved the final version of the response. See id. at 2 ("Thank you, Ken [Kanfer]. The letter is good to go").[FN6]
That response took the form of a letter from Kanfer to Thrasher, dated June 16, 2015, on which Abitbol was copied:
I am writing as a follow-up to our telephone conversation yesterday and in response to your letter dated June 12, 2015 addressed to [Royal]. This letter is also submitted on Royal's behalf for authority to Sublease the Premises to [Urban].
Urban is a New York corporation that is planning to provide indoor soccer facilities in the New York metropolitan area. The Company organizes competitive and recreational league play for men, women, children, and co-eds on a daily basis. I have a [sic] enclosed a CD which contains a power-point analysis of Urban and its programming as well as architect's plans for proposed alterations to the Premises.
Earlier this year, Royal was approached by Urban to sublease the Premises and, on June 1, 2015, a Sublease and Guaranty were executed, copies of which are enclosed. The salient features of the Sublease are as follows:
[said features omitted]
These clauses are intended to provide a brief outline of material terms. Together with Urban's attorney, architect, and principals, we are available to discuss the Sublease in greater detail and would gladly meet with you and your colleagues to provide additional information and answer any questions.
I look forward to hearing from you regarding next steps.
Thank you for your consideration. See Dkt. 21 (the June 16 Letter) (emphasis added).
Thereafter, Urban continued to seek City approval, for instance, by continuing to meet with the Brooklyn Borough Commissioner, who Abitbol claimed "approved the change of use." See Dkt. 36. However, on July 21, 2015, Kanfer received a letter from Thrasher, dated July 17, 2015, responding to the June 16 Letter. See Dkt. 22 (the July 17 Letter). It states:
As noted in prior correspondence, Section 14.02 of the Lease requires the [City's] consent to sublease. [EDC] denies [Royal's] request, because the proposed use under the proposed Sublease does not comply with the use provision of the Lease [EDC] will consider a proposed sublease that complies with the use provision, and all other provisions, of the Lease. If you would like to develop another proposal for subleasing the Premises, we encourage you to engage [EDC] early in the development of that proposal. See id. (emphasis added). Kanfer emailed the July 17 Letter to Abitbol and asked him what Urban's next steps would be.
Despite the July 17 Letter, Urban did not cease its efforts to obtain City approval. Among other things, Abitbol informed Kanfer that Urban had retained another law firm to file an expedited ULURP application. On August 3, 2015, Abitbol emailed Kanfer to tell him that "[w]e have received the approval for the change of use," a copy of which is attached to the email. See Dkt. 37. On August 11, 2015, Abitbol reported that Urban had retained a lobbying firm to help submit a formal proposal to EDC, and in an August 21, 2015 email, Abitbol wrote to Kanfer:
Here is a quick update. Over the last week, the lobbyists have met with EDC, which hinted that it was not really opposed to the project but was not eager to get into another battle with [Council Member] Carlos Menchaca who was pretty difficult about the South Brooklyn Marine Terminal revitalization plans earlier this year. The lobbyists then made contact with Mr. Menchaca who does not seem to be against the project either but stated that he wanted more information about Urban Soccer's intent. My clients have forwarded the Urban Soccer presentation, the letters of support from MLS, Red Bulls, St John's University and a few local schools. We are in the process of lining up additional local schools and explain local community benefits, which appear to be an important factor for Mr. Menchaca.
We expect to meet with him in the first week of September. We believe that if we get his support, the EDC will follow suit and reverse its decision.See Dkt. 39.
The parties had a follow up meeting on September 2, 2015, at which Urban remained optimistic. Shortly thereafter, Urban informed Royal of positive feedback received from Menchaca. 
Then, on September 8, 2015, Abitbol informed Kanfer that he considered the Sublease to be null and void because EDC had not approved it. On September 17, 2015, Abitbol sent the following email to Kanfer: 
Further to our conversation, I confirm that the public affairs firm retained by [Urban] received unequivocal indication from EDC that EDC will not reverse or amend the terms of [the July 17 Letter] denying the request for Sublease filed by [Royal]. [Urban] has exhausted the already limited actions that were available to it, if any, given that, as previously indicated by EDC, EDC will only deal directly with [Royal]. The Sublease, being subject to obtaining the consent of [the City] (through EDC), is thus null and void and [Urban] is requesting the return of its security deposit and the original of the guaranty provided by Mr. Francois Chateau. See Dkt. 23.
Kanfer's colleague, Franklyn Snitow (Royal's counsel in this action), responded by email on [*4]September 18, 2015, disputing Urban's right to recover its Security Deposit. See Dkt. 24. Snitow stated, among other things:
This is a transparent attempt to recast the parties' obligations under Rider in order to provide Urban with an exit strategy. Your current position is also belied by [the July 17 Letter]. That letter is the only communication we received from EDC concerning the Sublease [FN7]
and does not state or infer that EDC either refused to deal with Urban or would only deal with Royal. If that was the case [Urban] would not have vigorously pursued its application for consent over the last sixty days, would not have retained lobbying firms, would not have pursued its application with the Buildings Department, would not have secured the support of Councilman Menchaca and would not have requested a time extension from Royal. See id. (emphasis added).
Abitbol responded by email on September 22, 2015, in which he began by indicating that he had never received a copy of the June 12 Letter, took the position that EDC had denied approval in that letter, and that Urban would never have continued to pursue the City's consent had it known about the June 12 Letter. See Dkt. 25. Kanfer immediately responded to that email by sending Abitbol a copy of the June 12 Letter. See Dkt. 26. On October 7, 2015, Snitow emailed Abitbol to tell him that a further exchange of emails would be pointless given their disputes over the meaning of the Sublease and the Rider. See Dkt. 27.
Urban commenced this action on October 30, 2015. Its complaint asserts four causes of action: (1) a declaratory judgment regarding the parties' rights to the Security Deposit under the Sublease; (2) breach of the Sublease for failure to return the Security Deposit; (3) unjust enrichment; and (4) violation of General Obligation Law (GOL) § 7-103. See Dkt. 2. On December 3, 2015, Royal filed the instant motion to dismiss and for sanctions (particularly for the complaint's lack of candor about the terms of the Rider and other alleged misstatements, such as paragraph 30, noted earlier). The court reserved on the motion after oral argument and ordered the parties to mediation. See Dkt. 31 (3/31/16 Tr.). In the event mediation failed (which it did), the parties were directed to submit supplemental affirmations from their counsel regarding Urban's knowledge and receipt of the June 12 Letter. See id. at 16, 35. Those supplemental submissions were filed on July 8, 2016 [see Dkt. 33-39], at which time the motion was marked fully submitted. 
Kanfer's affirmation was discussed earlier. See Dkt. 34. In Abitbol's affidavit, he states that he first received the June 12 Letter on September 22, 2015. See Dkt. 33. He does not state that he ever, previously requested a copy of the June 12 Letter from Kanfer, nor does he deny knowing about it on June 15, 2015, when he helped draft a response to it.II. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. Amaro v Gani Realty Corp., 60 AD3d 491 (1st Dept 2009); Skillgames, LLC v Brody, 1 AD3d 247, 250 (1st Dept 2003), citing McGill v Parker, 179 AD2d 98, 105 (1st Dept 1992); see also Cron v Hargro Fabrics, Inc., 91 NY2d 362, 366 (1998). The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. Skillgames, id., citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 (1977). Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. Amaro, 60 NY3d at 491. "However, factual allegations that do not state a viable cause of action, that consist [*5]of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-New York News Syndicate, 204 AD2d 233 (1st Dept 1994). Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 (2002) (citation omitted); Leon v Martinez, 84 NY2d 83, 88 (1994).
As an initial matter, the court dismisses Urban's unjust enrichment and declaratory judgment claims. Where, as here, a written contract governs the parties' rights, an unjust enrichment claim cannot be maintained. See MG W. 100 LLC v St. Michael's Protestant Episcopal Church, 127 AD3d 624, 626 (1st Dept 2015) ("the existence of a valid and enforceable written agreement governing the parties dispute [] precludes recovery in quasi contract for events arising out of the same subject matter"), citing Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388 (1987). Likewise, where, as here, the plaintiff seeks affirmative relief under a breach of contract claim that requires the court to resolve the very contractual interpretation dispute at issue in the declaratory judgment claim, the declaratory judgment claim should be dismissed. See Cherry Hill Market Corp. v Cozen O'Connor P.C., 118 AD3d 514, 515 (1st Dept 2014), citing Apple Records, Inc. v Capitol Records, Inc., 137 AD2d 50, 54 (1st Dept 1988) ("A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract.").
That said, Urban's breach of contract claim is without merit. It is undisputed that Urban knew that EDC rejected the Sublease in mid-July 2015 and that EDC had raised issues with the Sublease the prior month in the June 12 Letter. Nonetheless, Urban sought to change EDC's mind between mid-July and mid-September 2015. The parties dispute their entitlement to the Security Deposit when, in mid-September 2015, Urban disclaimed any further intent to try to persuade EDC to reconsider. While the parties do not dispute that section 12.1 of the Sublease requires the Security Deposit to be returned to Urban if it "faithfully performs every provision of [the] Sublease," that provision is not dispositive.
This case turns on the meaning of the original section 2.3(B) as modified by the Rider. Urban relies on the following portion of the original section 2.3(B):
If NYC Consent is not received within sixty (60) days after Royal delivers the executed Sublease to Urban, Royal has the right, in its sole discretion, to terminate this Sublease at which point the Security Deposit and the original Guaranty shall be immediately returned to [Urban].See Dkt. 8 at 4 (emphasis added).
Sixty days under this clause is August 11, 2015 (the Sublease was delivered on June 11, 2015). At that point, Royal had the unilateral option to terminate and return the Security Deposit to Urban. 
Royal contends that the original section 2.3(B) does not govern nor is it dispositive. For one thing, this provision only permits Royal to terminate. Here, it was Urban that purported to terminate. Royal, moreover, maintains that the Rider's amendment of section 2.3(B), and not the original section 2.3(B), governs the outcome here. The Rider, in pertinent part, provides:
If NYC Consent is not received within five (5) months of [Royal's] delivery of the executed Sublease to Urban Royal has the right, in its sole and absolute discretion, to terminate this Sublease and retain the Security Deposit as a fee for Royal having refrained from offering the Premises for sublease to another party and having not received any rent during the five (5) month period. If this Sublease is terminated as provided for herein, Royal shall [*6]return the original Guaranty to [Urban]. See Dkt. 8 at 35 (emphasis added).
The Rider changed two material terms from the original section 2.3(B). First, it extended the time for Royal to terminate from 60 days to 5 months, i.e., to November 11, 2015. Second, the Rider changed the consequence of Royal exercising its option to terminate — instead of both the Security Deposit and Guaranty being returned to Urban, under the Rider, only the Guaranty would be returned to Urban.
In this case, Urban, not Royal, purported to terminate the Sublease on the ground that the City did not provide consent and sought return of its Security Deposit. As Royal correctly contends, Urban had no such right and did so before the November 11, 2015 deadline. In Royal's view, Urban is attempting to rewrite the Sublease and recoup the Security Deposit prior to the expiration of the five-month period. The Sublease does not permit this.
Under the Sublease, as amended by the Rider, Urban had five months to convince the City to consent to the Sublease. If such consent was not procured, Royal was entitled to keep the Security Deposit in consideration for not "offering the Premises for sublease to another party and having not received any rent during the [5] month period." This is an unambiguous expression of the parties' intent. See W.W.W. Assocs., Inc. v Giancontieri, 77 NY2d 157, 162 (1990) (ambiguity "is a question of law to be resolved by the courts."); see also Ellington v EMI Music, Inc., 24 NY3d 239, 250 (2014) (contract is ambiguous only if there is more than one commercially reasonable interpretation); Cole v Macklowe, 99 AD3d 595, 596 (1st Dept 2012). In light of this clarity, the court may not consider parol evidence or the fairness of this bargain.[FN8]
 See Schron v Troutman Sanders LLP, 20 NY3d 430, 436 (2013); Greenfield v Philles Records, Inc., 98 NY2d 562, 569-70 (2002) ("if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."). 
The parties' disputes regarding Urban's understanding of EDC's position, particularly with respect to the June 12 Letter, also are of no moment. There is no question that, by the middle of July 2015, Urban knew that EDC had rejected the Sublease. It, however, did not give up at that point, nor did it demand that the Sublease be terminated. Only in September 2015, after its lobbying efforts appeared to have failed, did Urban seek to recoup the Security Deposit. The contract, however, provides no basis for recoupment under these circumstances. It makes no distinction between the City rejecting the Sublease in July, or September, or November. Rather, all the Sublease, read with the Rider as it must be, provides is that Royal has the unilateral right to terminate and keep the Security Deposit if the City does not provide consent by November 11, 2015. The City did not. Urban's position that it had a right to terminate has no basis in the contract. If the parties intended for Urban to have such a right, they would have said so in the Sublease. The court must give effect to the parties' clear agreement that termination was an option unilaterally held by Royal.[FN9]

Finally, as an alternative means of recovering the Security Deposit in the event its contract claim fails (which, as noted, it does), Urban contends that Royal's alleged breach of GOL § 7-103 is an independent basis for awarding it the Security Deposit. § 7-103 applies to all money "deposited or advanced on a contract or license agreement for the use or rental of real property as security for performance of the contract or agreement or to be applied to payments upon such contract or agreement when due." Urban contends that Royal violated two of the requirements set forth in § 7-103. 
First, Royal allegedly violated § 7-103(1) by commingling the Security Deposit with other funds. See 23 E. 39th St. Mgmt. Corp. v 23 E. 39th St. Dev., LLC, 134 AD3d 629, 631 (1st Dept 2015) (§ 7-103(1) "prohibits landlords from commingling security deposits with their own funds. Violation of the statute gives rise to an action in conversion and the right to immediate return of the funds."), citing Tappan Golf Drive Range, Inc. v Tappan Prop., Inc., 68 AD3d 440 (1st Dept 2009). Landlords who commingle funds in violation of § 7-103 "forfeit[] any right they had to avail themselves of the security deposit for any purpose', entitling plaintiff to its immediate' return notwithstanding that plaintiff may itself have breached the lease." Dan Klores Assocs., Inc. v Abramoff, 288 AD2d 121 (1st Dept 2001), quoting LeRoy v Sayers, 217 AD2d 63, 68 (1st Dept 1995). Urban's comingling allegation, however, has been refuted by Royal. See Dkt. 12 (bank statement showing Security Deposit was segregated).[FN10]

Urban's remaining claim is that Royal violated § 7-103(2), which requires the Security Deposit to be maintained "in a banking organization having a place of business within the state." It is undisputed that Royal placed the Security Deposit in a Wells Fargo account at a branch in New Jersey. It also is undisputed that Wells Fargo has branches in New York, that is, Wells Fargo has "a place of business within the state." The parties dispute whether § 7-103(2) requires the Security Deposit to be placed in a New York branch. While the statute does not expressly address this question, Urban avers that the so-called "separate entity rule", pursuant to which branches of banks in different jurisdictions are treated as separate entities for the purposes of enforcing judgments, should impel the court to interpret § 7-103(2) to require the Security Deposit to be maintained at a New York branch. See Motorola Credit Corp. v Standard Chartered Bank, 24 NY3d 149, 158 (2014) ("The separate entity rule provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to CPLR article 62 prejudgment attachments and article 52 postjudgment restraining notices and turnover orders."); B & M Kingstone, LLC v Mega Int'l Commercial Bank Co., 131 AD3d 259, 266 (1st Dept 2015) ("The separate entity rule is that each branch of a bank is a separate entity, in no way concerned with accounts maintained by depositors in other branches or at the home office") (quotation marks omitted). In Motorola, the Court of Appeals "decline[d] Motorola's invitation to cast aside the separate entity rule," and noted that "the doctrine has been a part of the common law of New York for nearly a century" and that "Courts [*7]have repeatedly used it to prevent the postjudgment restraint of assets situated in foreign branch accounts based solely on the service of a foreign bank's New York branch." See id. at 162.
Urban avers that the purpose of § 7-103(2) is to ensure that deposits are easily recoverable in New York by tenants once a judgment has been obtained against a landlord. Royal does not dispute these concerns, but claims that the separate entity rule is more concerned with foreign (i.e., non-U.S. based) branches, not branches in another state. Royal also contends that the Deposit does not qualify as a "security deposit" under § 7-103. Neither argument has merit.
With respect to the latter argument, § 7-103, despite referring to a security deposit by way of example, applies to a broad range of deposited money so long as the money is for "the use or rental of real property as security for performance of the contract or agreement or to be applied to payments upon such contract or agreement when due." While the Security Deposit was to be used as liquidated damages if termination under the Rider occurred, those same funds were also earmarked to be used as a classic security deposit if the Sublease was consented to by the City. Royal cites no case nor provides any authority that a deposit earmarked for multiple uses is not governed by § 7-103. The court finds that § 7-103 applies to the Security Deposit.
Royal's other argument with respect to out-of-state branches is more complicated to resolve. To be sure, Royal does not cite any case to suggest that the separate entity rule only applies to international branches. Indeed, if § 7-103(2) was enacted for the purpose of ensuring that a security deposit can be recovered easily in New York, it would be irrational for that statute to permit a deposit to be maintained in a New Jersey branch, as enforcing the judgment would require the tenant to commence proceedings in New Jersey. The point of the statute is for tenants to easily procure and enforce judgments to recover their deposits in New York. The court does not believe the Legislature intended § 7-103 to be interpreted to provide for such an easily exploitable loophole that would undermine the benefits of the in-state requirement. 
Nonetheless, unlike § 7-103's prohibition on commingling, the parties do not cite any authority that sets forth the consequences of maintaining the Security Deposit outside of New York. As noted earlier, not all violations of § 7-103 result in forfeiture, such as failure to provide timely notice of the bank account information. Neither the statute nor any case law cited by the parties (or independently reviewed by the court) provides for a remedy. It, therefore, is unclear what damages, if any, are appropriate for this violation committed by Royal. 
Under these circumstances, where no commingling occurred, where Urban did not suffer any damages, and where the subject contract provides that Royal is entitled to the Security Deposit, the court holds that Urban is not entitled to relief. As persuasive authority, the court relies on Purfield v Kathrane, 73 Misc 2d 194 (Civ Ct, NY County 1973), where the court addressed the consequences of violating § 7-103's notice requirements:
The question presented is whether violations of such provisions [of § 7-103] entitle the person making the deposit to a return of the deposit. Actually, the statutes themselves do not state that a violation of any of their provisions entitle such person to a return of his deposit. Where there has been commingling, such person may be entitled to the return of his deposit only because the statute declares that a trust has been created, and, under the law of trusts, a commingling constitutes a conversion entitling the cestui que trust to recover the trust funds. Presumably, if it were intended that any violation of the statute, should, of itself, require a return of the deposit, the statute would have said so. In the absence of such a statement, the Court concludes that the loss of the deposit was not the intended penalty. The Court observes that when it was intended to fix a specific [*8]penalty for a violation, specific provision was made. [See GOL 7-105(3) (declaring that any failure to comply with that section is a misdemeanor)]. Accordingly, the Court finds that violations of the notice provisions do not entitle plaintiffs to a return of a deposit. Id. at 203 (emphasis added).
Here, too, the requirement to maintain the Security Deposit in a New York branch is a technical statutory violation that, like failure to provide notice and unlike commingling, is not a fiduciary violation. Hence, under the logic on Purfield, with which the court agrees, Royal's violation does not result in forfeiture.
Finally, the court declines to impose sanctions. While the complaint's allegations might have been pleaded more clearly and precisely, the court does not find that Urban's allegations justify sanctions. Urban, at the very least, has pleaded a statutory violation, albeit one that does not afford it relief under these circumstances. Accordingly, it is 
ORDERED that the motion by defendant Royal Wine Corporation to dismiss the complaint is granted, the motion for sanctions is denied, and the Clerk is direct to enter judgment, in favor of said defendant and against plaintiff Urban Soccer Inc., dismissing the complaint with prejudice.
Dated: August 5, 2016
ENTER:
J.S.C.
Footnotes

Footnote 1:References to "Dkt." followed by a number refer to documents filed in this action in the New York State Courts Electronic Filing (NYSCEF) system.
Footnote 2:The reason for the supplemental submissions is discussed herein.

Footnote 3:The parties agree that executed versions of the Sublease were not exchanged until June 11, 2015. See Dkt. 13 at 8. The Lease between Royal and the City is Exhibit C to the Sublease. See Dkt. 8 at 41.
Footnote 4:It should be noted that section 21.11 of the Sublease states that Urban's guarantor, Francois Chateau, is an attorney, and that he personally negotiated the terms of the Sublease. See Dkt. 8 at 29.

Footnote 5:Kanfer does not claim that he actually sent the June 12 Letter to Abitbol on June 15. Nor does Kanfer specifically indicate if they discussed the ULURP issue. That said, Kanfer contends that Abitbol was aware of the need for ULURP approval since February 2015. See Dkt. 34 at 5.

Footnote 6:This collaboration between Kanfer and Abitbol belies the allegation in paragraph 30 of the complaint that Urban was "unaware of EDC's" stated position" regarding the Sublease. Even assuming Abitbol did not receive a copy of the June 12 Letter, he indisputably knew about it (and could have asked to see it) since he assisted in drafting the parties' response to EDC, which, as noted above, begins by making reference to the June 12 Letter.

Footnote 7:In reality, the June 12 Letter was a second, prior letter from EDC.

Footnote 8:Indeed, the parties were represented by independent counsel in drafting the provisions at issue. Undoubtedly, Royal was interested in mitigating the hundreds of thousands of dollars it owed in rent to the City, and Urban, as demonstrated by its no doubt expensive lobbying and legal efforts, was interested in establishing a lucrative business in New York City.

Footnote 9:It should be noted that, regardless of whether the June 12 Letter was actually sent to Abitbol, the outcome would not differ. Abitbol knew of the June 12 Letter, yet never asked for a copy until September 2015. As noted, Urban was aware of all of the impediments to procuring the City's consent. Hence, even if Royal breached section 2.3(D) of the Sublease by failing to promptly provide Urban with a copy of the June 12 Letter, that breach was not material, nor did Urban suffer any resulting damages.

Footnote 10:Even if Royal did not provide timely notice under § 7-103(2) to Urban of the bank where the funds were held, such a violation would only create a rebuttable presumption that the funds were commingled. See Paterno v Carroll, 75 AD3d 625, 628 (2d Dept 2010), citing Dan Klores Assocs., 288 AD2d at 121. As noted, Royal rebutted that presumption by proving that the funds were not commingled.