OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequence numbers 001 and 002 are consolidated for disposition.
Defendants the City of New York (the City) and the New York City Administration for Children’s Services (ACS) (collectively, the NYC defendants) move, pursuant to CPLR 3211, to dismiss the claims asserted against them in the amended complaint (the AC). (Sequence No. 001.) Defendant Leake & Watts Services, Inc. (LWS) separately moves to dismiss the claims asserted against it in the AC and for sanctions against plaintiff Michael R. Gianatasio, PE, P.C. (MRG). (Sequence No. 002.) MRG opposes both motions and cross-moves for sanctions against LWS. For the reasons that follow, defendants’ motions to dismiss are granted and the cross motions for sanctions are denied.
I. Factual Background and Procedural History
As this is a motion to dismiss, the facts recited are taken from the AC (see Doc No. 33)[1] and the documentary evidence submitted by the parties.
This action concerns the NYC defendants’ failure to pay MRG the full amount owed under two construction contracts. The NYC defendants admit nonpayment and have no issue with the quality of MRG’s work. They contend, however, that the contracts are illegal and, therefore, unenforceable. The other defendant in this action, LWS, also seeks dismissal on the ground that the contracts only obligate the NYC defendants, and not LWS, to pay MRG.
*761 In March 2012, Governor Cuomo signed what is known as the “Close to Home” legislation, which authorizes the City to house young people who were adjudicated as delinquent by the Family Court to be placed in secure facilities near their homes. (See AC ¶¶ 14-15.) The facilities would be under the auspices of and in buildings owned by ACS. A not-for-profit entity, in this case LWS, would provide the youth services. (Id.)
In November 2014, ACS reached out to and hired MRG to build two of the six facilities. Those two facilities are located at 170 East 210th Street in the Bronx (the Bronx location) and 1125 Carroll Street in Brooklyn (the Brooklyn location) (collectively, the facilities). ACS wanted both facilities to be operational by March 13, 2015. Consequently, in November 2014, ACS asked MRG to begin work immediately even though contracts for the work had not yet been executed. MRG agreed to do so, commencing work at the Bronx location on November 15, 2014 and at the Brooklyn location on December 8, 2014. The parties negotiated the contracts during the next few weeks. The final versions are dated December 3, 2014 (see Doc No. 56 [the Bronx contract]; Doc No. 57 [the Brooklyn contract] [collectively, the contracts])[2] and were fully executed on December 23, 2014. (See Doc No. 56 at 6; Doc No. 57 at 8-9.) LWS signed as “Financial Conduit/Service. Provider,” ACS signed as “Managing Agent,” and MRG signed as “General Contractor.” (See id.) The contracts were approved by ACS’s commissioner.[3]
The contracts provide that “[LWS] shall promptly reimburse, once they receive payment from ACS, MRG all costs incurred in connection with the Services rendered.” (See Doc No. 56 at 4 [emphasis added]; Doc No. 57 at 7.) The contracts also provide that “MRG shall provide standard general liability, workman’s compensation, professional liability and disability insurance naming [LWS] as certificate holder and additional insured.” (See id.)
The total price of the Bronx contract is $4,598,000. (See Doc No. 56 at 5.) The initial deposit was $1,532,667; $1,500,000 *762 was due on February 2, 2015; $1,000,000 was due on March 2, 2015; and the final $565,333 was due on April 3, 2015. (See id. at 6.) The total price of the Brooklyn contract is $1,565,120. (See Doc No. 57 at 8.) The initial deposit was $521,000; $521,000 was due on February 2, 2015; $261,560 was due on March 2, 2015; and the final $261,560 was due on March 15, 2015. (See id.)
MRG was partially paid pursuant to the contracts. Under the Bronx contract, MRG 'received the initial deposit of $1,532,667 on December 29, 2014 and $1,500,000 on February 11, 2015, for a total of $3,032,667. MRG was not paid on its third invoice of $1 million, was not paid on a $20,000 purchase order issued by ACS, and was out of pocket $61,000 because MRG had to pay one of its subcontractors a restocking fee due to ACS’s nonpayment. Under the Brooklyn contract, MRG received $521,707 on December 24, 2014 and $521,000 on February 12, 2015, for a total of $1,042,707. MRG was not paid on its third and fourth invoices in the amounts of $261,560 and $260,853, was not paid for $20,000 of work performed under a purchase order issued by ACS, and was not paid for $109,250 of work performed under a change order.
In early March 2015, MRG requested payment of these amounts. On a March 4, 2015 phone call between MRG and ACS, ACS’s deputy commissioner, Mitch Gipson, discussed ACS’s failure to pay and attempts to remedy the nonpayment. In the recorded conversation, he stated, among other things, that “Close to Home . . . is a project that is near and dear to both the governor and the mayor. . . . [E]veryone is becoming very thoughtful and cautious about how we fix a problem which I, unfortunately at the moment, can’t describe to you in detail.” (See Doc No. 83 at 6.) Gipson noted that ACS was discussing the issue directly with “City Hall.” (See id. at 7 [emphasis added].) He stated:
“I want to just say to you that it would be very, very harmful to everybody if .. . MRG or any other contractor or general contractor or CM stopped work. I understand the challenge that you’re in, . . . but there are others that are, I mean, officially, everybody is in this challenge . . . the spigot has been turned off by a directive, and we are now trying to figure out what we have to do to open it. . . So, you know, this is at the highest levels. I don’t know whether the mayor and the governor know *763 that we’ve done this, but I suspect it’s possible that they very well may, at some point. At least they will know what we’ve done to fix it.” (See id. at 7-8 [emphasis added].)
In other words, just as when ACS wanted MRG to begin working before entering into a contract, ACS was now asking MRG to continue expediting work despite not being paid. Gipson stressed “the sensitivity [of] this matter, because it goes all the way to the governor’s house” and that “any delay in bringing those young people closer to home will be frowned upon and disappoint people, including the governor.” (See id. at 10 [emphasis added].) Gipson did not know if the mayor was involved, but stated that “I know [the] deputy mayors are involved in this.” (See id. at 14.)
On March 11, 2015, Gipson again spoke with MRG. He stated in the recorded conversation:
“So just so you understand a little bit, I’ll have to go back a little bit in time to when we approached you in the first place. We were at a point where we realized that we could not do this work with our internal staff. And so we needed, and we weren’t sure of the scope and time, the time and cost of the work had apparently surprised us. And that was an initial frustration of mine, back in November or December. So we reached out to you and another party and the idea was to confirm how much this would cost and confirm how much, how long it would take, and to get a sense of what you would— how much you would charge us to do the work. The thought process then was that due to our procurement rules, we knew we couldn’t hire you within a timeframe that would allow us to meet the schedule, which was the end of March. Our procurement rules would’ve taken maybe three or four months, at least, and so that was a nonstarter. Our procurement rules though do allow for a subcontractor of ours, in this case [LWS], to enter into a contract with a third party to do construction work. And that is what’s going on on most of our sites, and now this one, these two. But these two sites that we approached you on were the only two that weren’t being managed in that fashion, and we realized that that was a mistake, so we endeavored to back into an agreement that was similar to our other agreements, in which the — our subcontractor, well, we have three of them, [LWS] being one of them, were to actually *764 . . . contract with the provider. They can do so through a process that is internal to them, but not internal to us, so it’s quicker. And that allowed us to maintain schedule. All good, except that once we sign a document, it becomes our contract as well as their contract, and then it’s subject to our rules, which we then have to go through and fix all these marks, which we endeavored to not have to do by going to [LWS].” (See id. at 18-19 [emphasis added].)[4]
In other words, Gipson explained that ACS circumvented the City’s procurement rules by entering into a contract with a private company, which was a service provider not subject to the rules, and having that company directly contract with the construction company. ACS agreed to pay the contractor through the private company (the service provider) and indemnify the private company.[5] This allowed ACS to avoid a multitude of regulations, such as putting the contract up for public bidding and paying the requisite prevailing wage.[6] The four other Close to Home projects, one of which also involved LWS, were constructed and fully paid for by ACS without a problem. In this case, as noted in the recorded conversation, ACS made a “mistake” by directly contracting with MRG, and that caused scrutiny of the contract and prevented MRG from *765 being paid. Gipson was candid with MRG about this “mistake,” explaining:
“Okay. So our mistake was in agreeing to sign that document, because it should’ve been a document just between the two of you [Le., MRG and LWS]. We still would’ve taken on the role that we have taken on, that’s certainly within our purview, and [LWS] could easily say well, you know, hey can you help by overseeing the work. Of course that’s not a problem. We had a parson here who was charged to do that . . . and that was not a problem. However, that arrangement, being codified, if you will, into the contract became a problem. That has gotten us into a mess. And we have to. undo it, simply put.” (See id. at 19-20 [emphasis added].)
Gipson continued:
“We can’t proceed — it’s actually — the mess it’s gotten us into is that it’s inhibiting our ability to register the contracts that we have, the agreements that we have with [LWS]. There’s a — it is in its own process of being registered, and that is through the normal procurement process, and it ends up being signed off by the City’s counselor, which by the way is an elected official, not a part of the mayor’s team. And they are the gatekeeper, if you will, of contract management. So we have to now rectify this piece, not in terms of, again, procedure, in terms of who does what, per se, but in terms of maintaining our original intent, and maintaining our ability to say we’re doing the right thing to our oversight agencies. We cannot be a party to this contract. So you need now to reestablish a contract with [LWS] that does not include our signature. Simple enough to say, but once you get legal people involved in this, it gets complicated. I don’t know how complicated that is, really. It shouldn’t be. But if all parties are playing the game to collectively win, it shouldn’t be a problem. But we have instructed [LWS] to try to contract another contract with you, to undo this one and sign a new one that doesn’t include us as a signatory.” (See id. at 20-21 [emphasis added].)
Gipson would go on to note that LWS may be concerned about being the contracting party responsible for payment, but noted that “they should be fine” due to “protections under [LWS’s] *766 agreement with [ACS].” (See id. at 21-22.) The parties then corresponded by email to discuss ACS facilitating a contract between MRG and LWS. (See Doc No. 79 at 14-15.) In a March 13, 2015 email, ACS’s general counsel, Joseph Cardieri, stated that “[t]he City has been actively involved in addressing outstanding issues so that the contract can be submitted for registration.” (See id. at 15.)
In short, ACS used regulatory arbitrage in the other four projects to complete the projects expeditiously. It circumvented the procurement regulations in the other four projects by using LWS as cover. Indeed, it attempted to do the same for MRG after the fact and rued its misstep in failing to use LWS, originally, for that purpose. Simply put, ACS sought to evade the regulatory requirement by having LWS contract with the actual general contractor (here, MRG), while ACS separately agreed to pay and indemnify LWS, a service organization which was to run the group homes but did not own the property and was not responsible for renovating it.
In the end, MRG never entered into a new contract with LWS, never was paid the outstanding amounts for work done, and never completed the construction. On May 15, 2015, MRG commenced this action by filing a summons with notice in Supreme Court, Westchester County, under index No. 58815/ 2015. MRG filed a complaint on June 1, 2015. (See Doc No. 8.) On June 22, 2015, LWS moved to dismiss for failure to state a claim. On July 28, 2015, the NYC defendants moved to change venue to New York County. By order dated December 1, 2015, the court (Scheinkman, J.) granted the NYC defendants’ motion and ordered that venue be changed to New York County. (See Doc No. 47.)[7] In the interim, on July 29, 2015, MRG filed the AC, which contains six causes of action, numbered here as in the complaint: (1) breach of the Bronx contract, asserted against all defendants, in the amount of $1,081,000; (2) breach of the Brooklyn contract, asserted against all defendants, in *767 the amount of $651,663; (3) quantum meruit, asserted against all defendants, in the amount of $1,732,663; (4) account stated, asserted against the NYC defendants, in the amount of $1,671,663; (5) unjust enrichment, asserted against all defendants, in the amount of $1,732,663; and (6) fraudulent inducement of the contracts, asserted against the NYC defendants. (See Doc No. 33.)
After this action was transferred to this court, on January 22, 2016, defendants filed the instant motions to dismiss. The NYC defendants principally argue that they cannot be held liable because the contracts are illegal. LWS contends it has no obligation under the contracts to pay MRG because it was only a “financial conduit.” The court reserved on the motions after oral argument. (See Doc No. 110 [June 15, 2016 tr].)
II. Discussion
A. Legal Standard
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [1st Dept 2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1st Dept 1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. (Skillgames at 250, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d at 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed only if “the documentary evidence utterly refutes plaintiff’s factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002] [citation omitted]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
*768 B. The NYC Defendants’ Motion to Dismiss (Sequence No. 001)
The NYC defendants contend that the contracts do not conform to the requirements of General Municipal Law § 103, which mandates that “all contracts for public work [involving the expenditure of more than $35,000] ... be awarded ... to the lowest responsible bidder.” (See Matter of L&M Bus Corp. v New York City Dept. of Educ., 17 NY3d 149, 156 [2011].) “Dual aims underlie the[ ] requirements [of section 103]: ‘(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts.’ ” (Id., quoting Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d 56, 68 [1996]; see also Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148 [1985] [“the purpose of the laws in this State requiring competitive bidding in the letting of public contracts is ‘to guard against favoritism, improvidence, extravagance, fraud,and corruption’”], quoting Jered Contr. Corp. v New York City Tr. Auth., 22 NY2d 187, 193 [1968].) “These laws were not enacted to help enrich the corporate bidders but, rather, were intended for the benefit of the taxpayers. They should, therefore, be construed and administered ‘with sole reference to the public interest.’ ” (Conduit, 66 NY2d at 148, citing Jered, 22 NY2d at 192-193.)
MRG does not dispute that section 103 applies to the contracts or that section 103 was violated because the required bidding did not occur. The City does not contend that this is a case involving waste of taxpayer money due to overpayment, shoddy work, or corruption. Rather, the parties agree that ACS awarded the contracts to MRG without adhering to section 103 because, without doing so, it would have been impossible to meet the City’s deadline to construct the facilities by March 2015 and quickly achieve the laudatory goal of housing young people close to their families and homes. The motive here appears to have been to prioritize efficiency and quality and avoid delay. ACS simply sought to get the job done — well and on schedule. Doing so while adhering to section 103 would have been impossible. Nonetheless, however laudable the goals and however faultless the work of MRG, the law was violated.
It is within this context that the parties dispute whether MRG may enforce the contracts against the NYC defendants notwithstanding the violation of section 103. The NYC *769 defendants correctly contend that, ordinarily, “where there is a lack of authority on the part of agents of a municipal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed.” (Henry Modell & Co. v City of New York, 159 AD2d 354, 355 [1st Dept 1990], quoting Lutzken v City of Rochester, 7 AD2d 498, 501 [4th Dept 1959]; see also Casa Wales Hous. Dev. Fund Corp. v City of New York, 129 AD3d 451, 451 [1st Dept 2015] [“The courts of this state have long held that ‘no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city’ ”], quoting Seif v City of Long Beach, 286 NY 382, 387 [1941].) Hence, “[m]unicipal contracts which violate express statutory provisions are invalid.” (Granada Bldgs. v City of Kingston, 58 NY2d 705, 708 [1982].) This is true even if the party contracting with the municipality is ignorant of the relevant regulations because “those dealing with municipal agents must ascertain the extent of the agents’ authority, or else proceed at their own risk.” (Casa Wales, 129 AD3d at 451; see Walentas v New York City Dept. of Ports, 167 AD2d 211 [1st Dept 1990], citing City of Zanesville, Ohio v Mohawk Data Sciences Corp., 97 AD2d 64, 66 [4th Dept 1983] [“New York, for policy reasons, choose(s) to place the risk of loss on parties dealing with municipal corporations. Those dealing with officers or agents of municipal corporations must at their peril see to it that such officers or agents are acting within their authority” (citations omitted)]; see also Steiner Egg Noodle Co. v City of New York, 63 Misc 2d 163, 165-166 [App Term, 1st Dept 1969] [“A long, impressive line of cases . . . has firmly established as fundamental the principle that one dealing with a municipality through its officials must take great care to learn the true nature and extent of their power and authority. One relies on the self-asserted, naked representation of an official’s power and authority to bind the municipality at one’s peril”], affd 34 AD2d 892 [1st Dept 1970].)
It follows, the NYC defendants aver, that MRG’s claims against them must fail simply by virtue of the well settled rule that “once a contract is proved to have been awarded without the required competitive bidding, a waste of public funds is *770 presumed[8] and a taxpayer is entitled to have the contract set aside without showing that the municipality suffered any actual injury.” (See Gerzof v Sweeney, 16 NY2d 206, 208 [1965] [emphasis added; collecting cases].) “It is sufficient in such a situation that the public ‘has been deprived of the protection which the law was intended to afford.’ ” (Id. at 209, quoting Matter of Emigrant Industrial Sav. Bank, 75 NY 388, 396 [1878].) Additionally, the NYC defendants contend that the contracts are not enforceable because they were never approved by Corporation Counsel and registered with the Comptroller. (See JFK Holding Co., LLC v City of New York, 68 AD3d 477, 478 [1st Dept 2009], citing Granada, 58 NY2d at 708; see also Matter of DeFoe Corp. v New York City Dept. of Transp., 87 NY2d 754, 760 [1996] [“Although a contract has been awarded by a municipal agency, such contract is not effective until it has been registered”].)
MRG seeks to estop the NYC defendants from asserting these defenses. Estoppel, however, “does not generally lie against municipalities.” (JFK, 68 AD3d at 478, citing Matter of Parkview Assoc. v City of New York, 71 NY2d 274, 282 [1988].) “Estoppel can be invoked against a municipality or municipal agency only in the rarest cases.” (Casa Wales, 129 AD3d at 451 [emphasis added; internal quotation marks and citations omitted]; see LoCiciro v Metropolitan Transp. Auth., 288 AD2d 353, 355 [2d Dept 2001], quoting Nowinski v City of New York, 189 AD2d 674, 675 [1st Dept 1993] [this exception “is to be invoked sparingly and only under exceptional circumstances”].)
MRG relies on the exception to this rule, arguing “where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised.” (Bender v New York City Health & Hosps. Corp., 38 NY2d 662, 668 [1976] [emphasis added].) Courts “have not hesitated to do so where a municipality’s misleading nonfeasance would otherwise result in a manifest injustice.” (Landmark Colony at Oyster Bay v Board of Supervisors of County of Nassau, 113 AD2d 741, 744 [2d Dept 1985] [emphasis added], citing Matter of 1555 Boston Rd. Corp. v Finance Adm’r of City of N.Y., 61 AD2d 187, 191-192 [2d Dept 1978] [“the city prevailed on its contention that *771 the real estate owner could not withdraw from the settlement even though it had not been approved by the Comptroller. Under the circumstances it is not only egregiously unfair, but an act of effrontery, for the city to here insist that it may renege on its agreement after the petitioner, in reliance on the settlement, failed to take legal steps, which it now cannot take, to challenge the assessment” (some emphasis added, some emphasis omitted)].) This is not such a case. (See Parsa v State of New York, 64 NY2d 143, 147 [1984] [“the State’s acceptance of benefits furnished under a contract made without authority does not estop it from challenging the validity of the contract or from denying liability pursuant to it”].)
There is no doubt that the City acted unlawfully and treated MRG unfairly. The City failed to pay MRG more than $1.5 million for work done and money outlaid. ACS begged MRG to expedite a public policy driven project and now refuses to pay all that it owes MRG. Nonetheless, despite the inequities here, there is clear, binding precedent that precludes this court from enforcing the contracts against the NYC defendants. As the First Department recently held in a case where, as here, the subject contract did not comply with procurement requirements, the contract is unenforceable and estoppel against the municipality is unwarranted. (See Casa Wales, 129 AD3d at 451-452.) It does not matter that the municipality or its agents violated the law. The very purpose of prohibiting the enforcement of illegal contracts with municipalities is “to protect the public from corrupt or ill-considered actions of municipal officials.” (Henry Modell & Co., 159 AD2d at 355.) That is why, as noted earlier, “those dealing with municipal agents must ascertain the extent of the agents’ authority, or else proceed at their own risk.” (See id.) As the NYC defendants correctly note, MRG “proffers no case where the government was estopped from preventing the enforcement of an agreement that violates statutorily required competitive bidding.” (See Doc No. 106 at 11.) Cases such as Casa Wales and Henry Modell & Co. demonstrate that the sort of estoppel argument proffered here will not overcome the contracts’ illegality.
There is, of course, intuitive appeal in declaring the instant situation manifestly unjust. However, if estoppel would apply here, it would likely apply in all situations where the City refused to make payment on an unbid contract that was partially performed and where the work was properly and timely done. Such a conclusion cannot be squared with the *772 cited case law. To be sure, estoppel based on manifest injustice has been found outside of the contractual context, such as in Bender (38 NY2d at 665-666), where the City misled plaintiff about where its notice of claim was to be filed under a new statutory scheme; in Matter of Rudey v Landmarks Preserv. Commn. of City of N.Y. (182 AD2d 61 [1st Dept 1992], affd 82 NY2d 832 [1993]), where the Landmarks Preservation Commission was estopped from preventing an apartment owner from replacing windows after obtaining permits from the Department of Buildings; and in Landmark Colony (113 AD2d at 744), where Nassau County was estopped from fining a company that illegally began construction where the company “was more a victim of bureaucratic confusion and deficiencies than the perpetrator of an inexcusable violation.” This is not a comparable situation. This is a classic case where the contracts were entered into illegally due to failure to comply with bidding and procurement regulations. Finding estoppel here due to the City’s culpability would result in the estoppel exception swallowing the rule because virtually all similar illegal contracts involve wrongdoing on the part of a city agency.[9] (See Gerzof, 16 NY2d at 208 [“once a contract is proved to have been awarded without the required competitive bidding, a waste of public funds is presumed and a taxpayer is entitled to have the contract set aside without showing that the municipality suffered any actual injury”].)
Nor can the fact that ACS paid MRG approximately 66% of the amounts owed under the contracts constitute a ratification. MRG correctly contends that partial payment can constitute ratification by a municipality of an otherwise legal contract entered into without authorization. (See East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc., 90 AD3d 815, 817 [2d Dept 2011] [“A contract that is not approved by a relevant municipal or governmental body, as required by law, rule, or regulation, may be ratified by the municipality or government body by subsequent conduct, such as by making payments pursuant to the contract”]; see also Seif, 286 NY at 387 [“Mere acceptance of benefits by the city under a contract made without authority does not estop a municipal corporation *773 from challenging the validity of the contract and from denying liability for materials furnished or services rendered under a contract not made or ratified by a board or officer acting under authority conferred by law and in the manner prescribed by law”].) However, an illegal contract cannot be ratified. (See Matter of New York State Med. Transporters Assn. v Perales, 77 NY2d 126, 131 [1990]; Downey v Lackawanna City School Dist., 51 AD2d 177, 180 [4th Dept 1976] [“the (B)oard (of Education) could not ratify a contract which was illegal from its inception”].)
Perales is instructive. There, the Court of Appeals wrote:
“No doubt recognizing the difficulty of their estop-pel claim, petitioners advance the closely related doctrine of ratification, contending that respondent knew of its agent’s practice, accepted the benefits, and is therefore bound. For much the same reason, that contention also must fail. . . .
“But petitioners’ arguments suffer from an even more fundamental flaw. Illegal contracts are not generally enforceable — a rule that applies as well to ratification. A principal cannot ratify an agent’s act that the principal itself could not have authorized. “Petitioners’ argument is that respondent ratified its agent’s act excusing compliance with the legal requirement that approval be obtained before transportation services are rendered. Neither the statute nor the regulation which imposes the requirement gives respondent discretion to excuse that legal requirement, and respondent thus could not ratify the fiscal agent’s practice of excusing compliance with the law.” (Perales, 77 NY2d at 131-132 [citations omitted; emphasis added].)
It is undisputed that the contracts are illegal due to their violation of General Municipal Law § 103 and, therefore, cannot be ratified by the City.[10]
*774 MRG’s alternative theories of recovery fare no better. A plaintiff may not recover in quantum meruit against a municipality under a quasi contract or unjust enrichment claim for work performed where, as here, there is a contract governing the work which is illegal and unenforceable. (See S.T. Grand, Inc. v City of New York, 32 NY2d 300, 305 [1973] [“the rule is that where work is done pursuant to an illegal municipal contract, no recovery may be had by the vendor, either on the contract or in quantum meruit. . . . The reason for this harsh rule, which works a complete forfeiture of the vendor’s interest, is to deter violation of the bidding statutes”], citing Gerzof v Sweeney, 22 NY2d 297, 304 [1968] [“If we were to sanction payment of the fair and reasonable value of items sold in contravention of the bidding requirements, the vendor, having. little to lose, would be encouraged to risk evasion of the statute; by the same token, if public officials were free to make such payments, the way would be open to them to accomplish by indirection what they are forbidden to do directly”]; see also Casa Wales, 129 AD3d at 451 [“The courts of this state have long held that ‘no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city’ ”], quoting Seif, 286 NY at 387.)
Likewise, an account stated claim is not maintainable “[i]n the absence of a claim establishing underlying liability.” (Unclaimed Prop. Recovery Serv., Inc. v UBS PaineWebber Inc., 58 AD3d 526 [1st Dept 2009], citing M. Paladino, Inc. v Lucchese & Son Contr. Corp., 247 AD2d 515, 516 [2d Dept 1998] [“An account stated assumes the existence of some indebtedness between the parties, or an express agreement to treat the statement as an account stated. It cannot be used to create liability where none otherwise exists” (emphasis added)].) Without a viable contract or quasi contract claim, MRG’s account stated claim fails.
Finally, MRG cannot maintain a claim that the NYC defendants fraudulently induced it to enter into the contracts. “The elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.” (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]; see Basis Yield Alpha Fund [Master] v Goldman Sachs Group, Inc., 115 AD3d 128, 135 [1st Dept *775 2014].) Pursuant to CPLR 3016 (b), “the circumstances constituting the wrong shall be stated in detail.” (Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 491 [2008].) MRG has not alleged any false statement made with scienter by the NYC defendants that induced MRG to execute the contracts and perform the work. “It is axiomatic that in order to state a claim for fraudulent inducement, ‘there must be a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury.’ ” (Wyle Inc. v ITT Corp., 130 AD3d 438, 438-439 [1st Dept 2015] [emphasis added], quoting GoSmile, Inc. v Levine, 81 AD3d 77, 81 [1st Dept 2010].) “In the context of a contract case, the pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract.” (Id. at 439 [emphasis added].)
At the time the contracts were executed, ACS had every intention of paying MRG. MRG does not allege otherwise. In fact, MRG was paid much of the money due under the contracts. It was only when the contracts could not be registered that payment stopped. Hence, the nonpayment arose from the subsequent discovery of the contracts’ illegality. This fact is incompatible with the notion that there was any intention not to pay MRG when the contracts were executed. The lack of a present intent to defraud at the outset precludes the fraud claim.
Equally crucial is the lack of justifiable reliance. MRG could have, and should have, been aware of the law requiring the job to be bid-out and could not justifiably rely on ACS’s invitation to work on a no-bid contract. (See 198 Ave. B Assoc. v Bee Corp., 155 AD2d 273, 274 [1st Dept 1989] [“Where a party has means available to him for discovering, by the exercise of ordinary intelligence, the true nature of a transaction he is about to enter into, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations” (citations and quotation marks omitted)], accord ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 [2015], citing Schumaker v Mather, 133 NY 590, 596 [1892]; see also Wildenstein v 5H&Co, Inc., 97 AD3d 488, 490 [1st Dept 2012] [plaintiff could not support claim against unlicensed architect for fraudulent inducement where she could have learned architect was not licensed from public records].)
*776 In sum, the claims against the NYC defendants are dismissed with prejudice.[11]
C. LWS’s Motion to Dismiss (Sequence No. 002)
MRG’s attempt to hold LWS liable under the contracts is unavailing. The contracts accurately state that LWS was merely a “Financial Conduit” between MRG and ACS. The parties’ intention that LWS was not, meant to be liable is reflected in the “Reimbursement Costs” section of the contracts, which provides that LWS merely is obligated to remit payment to MRG “once [LWS] receive[s] payment from ACS.” (See Doc No. 56 at 4.) The court does not find the contracts to be ambiguous in this regard. (See W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990] [ambiguity “is a question of law to be resolved by the courts”]; see also Ellington v EMI Music, Inc., 24 NY3d 239, 250 [2014] [contract is ambiguous only if there is more than one commercially reasonable interpretation].)[12]
MRG, moreover, cannot maintain an unjust enrichment claim against LWS because the subject work is governed by written contracts. (See IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009] [“Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded”], citing Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388 [1987].) That the contracts do not obligate LWS to pay MRG is incompatible with the notion that it is “against equity and good conscience” to prohibit MRG from recovering from *777 LWS. (See Georgia Malone & Co., Inc. v Rieder, 19 NY3d 511, 516 [2012].)
Lastly, the parties’ competing sanctions motions are denied. MRG’s claims are not frivolous and it, as the party equitably wronged here, does not deserve to be sanctioned. LWS, of course, is not sanctioned because its arguments in favor of dismissal are meritorious. Accordingly, it is ordered that the motions by defendants the City of New York, the New York City Administration for Children’s Services, and Leake & Watts Services, Inc. to dismiss the amended complaint are granted, the cross motions for sanctions are denied, and the Clerk is directed to enter judgment in favor of said defendants, and against plaintiff Michael R. Gianatasio, PE, P.C., dismissing the amended complaint with prejudice; and it is further ordered that within three days of the entry of this order on the NYSCEF system, plaintiff’s counsel shall publicly e-file complete, OCR text searchable versions of each of the telephone call transcripts filed in connection within the instant motions, including those filed at Doc No. 83.[13]

. References to “Doc No.” followed by a number refer to documents filed in this action in the New York State Courts Electronic Filing (NYSCEF) system.

. The contracts are governed by New York law and provide for venue in Westchester County. (See Doc No. 56 at 4; Doc No. 57 at 7.) This action is now pending in New York County for reasons discussed herein.

. The contracts set forth the scope of work, which will not be addressed since, as noted, defendants do not dispute the quality of MRGls performance. The contracts indicate a start date of December 22, 2014, despite the work having already begun weeks earlier at the City’s behest, and indicate an estimated project duration of 16 weeks. (See Doc No. 56 at 2; Doc No. 57 at 2.)

. General Municipal Law § 103 provides, in part:
“1. [Until June 1, 2018] Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three, all contracts for public work involving an experiditure of more than thirty-five thousand dollars and all purchase contracts involving an expenditure of more than twenty thousand dollars, shall be awarded by the appropriate officer, board or agency of a political subdivision or of any district therein including but not limited to a soil conservation district to the lowest responsible bidder furnishing the required security after advertisement for sealed bids in the manner provided by this section, provided, however, that purchase contracts (including contracts for service work, but excluding any purchase contracts necessary for the completion of a public works contract pursuant to article eight of the labor law) may be awarded on the basis of best value, as defined in section one hundred sixty-three of the state finance law, to a responsive and responsible bidder or offerer in the manner provided by this section.”

. As LWS’s counsel stated at oral argument: “But, Your Honor, whenever there was such an instance as that the City . . . indemnified [LWS] so [LWS] was never at risk for having [to pay] the contract.” {See Doc No. 110 [June 15, 2016 tr] at 15.)

. See Doc No. 83 at 22.

. The motion sequence numbers attributable to the motions filed in Westchester County are 001W and 002W. After this action was transferred to this court, the motions in this action began with 001. Thus, while the instant motions are the third and fourth in this case, the court will maintain NYSCEF’s nomenclature and refer to them as motion sequence numbers 001 and 002. It should be noted that all docket entries in this case, including those filed in Westchester County, appear on NYSCEF under the instant New York County index No. 453153/2015. Doc Nos. 1-50 were filed in West-chester County, and all documents thereafter were filed in New York County. It should be noted that by order dated April 18, 2016, Justice Scheinkman denied MRG’s motion for reargument of his decision to change venue. (See Doc No. 109.)

8. Apparently, the word “presumption” as used in the case is mandatory, not rebuttable.

. Notwithstanding the apparent inequity underlying the City’s position, the City, in fact, could not legally pay MRG, even if it wanted to. As discussed herein, a municipality may not ratify an illegal contract, even if, as here, it already made partial payment and accepted some of the contract’s benefits. (See City of Zanesville, Ohio, 97 AD2d 64.)

. If a contract awarded without the requisite bidding could be ratified on the ground that the City did not pay more than it would have had the contract been put up for bid, a municipality could routinely get away with no-bid contracts and later defend them on the ground that the City did not overpay. Moreover, even a genuine ex post lack of overpayment defense would still not address the incentive for cronyism, which General Municipal Law § 103 is supposed to deter. (See Conduit, 66 NY2d at 148 [one of section 103⅛ purposes is prevention of “favoritism”].) Deterrence, as noted below, is a core feature of section 103.

. Since the contracts are not enforceable against either of the NYC defendants, the court need not reach ACS’s separate argument that it is not amenable to suit under New York City Charter § 396, which “has been construed to mean that ACS is not a suable entity.” (Worrell v City of New York, 2014 WL 1224257, *3, 2014 US Dist LEXIS 39794, *8 [ED NY, Mar. 24, 2014, No. 12-CV-6151(MKB)] [collecting cases]; see Toth v New York City Dept. of City wide Admin. Servs., 119 AD3d 431 [1st Dept 2014].)

. Under the arrangement made for the other four projects, LWS or the other servicer companies acted as mere pass-through financial conduits, but still had actual (nominal) counterparty payment liability for regulatory arbitrage purposes (the legality of this arrangement is not before the court). That such an arbitrage framework was not in place here demonstrates that LWS was not intended to have liability. The only reason for LWS to have enforceable payment liability is if the government entity is not a party to the contract. Here, where ACS was a party to the contracts, it would make no sense for LWS to have separate liability. After all, it is not as if the City poses counterparty credit risk. Political risk, on the other hand, is another animal.

. LWS objects that MRG did not file the entirety of the recorded telephone transcripts. This is a violation of this part’s rule that complete transcripts must be filed and conflicts with the public’s right to have access to court records, especially here, where there is a public interest in the underlying events. MRG, therefore, must file the complete version of all the transcripts from which excerpts were submitted into the record. MRG is reminded that all e-filed documents must be OCR text searchable.